

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-18-2006

# Alaka v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 05-1632

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Alaka v. Atty Gen USA" (2006). *2006 Decisions.* Paper 658.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/658

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-1632

OYENIKE ALAKA,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES;
SECRETARY OF DEPARTMENT OF
HOMELAND SECURITY,

Respondents

On Petition for Review of an Order of
The Board of Immigration Appeals
(No. A91-581-986)

Argued March 9, 2006

Before: AMBRO and BECKER,[*] Circuit Judges,
STAGG,[**] District Judge

(Opinion filed July 18, 2006)

Joseph C. Hohenstein, Esquire (Argued)
Orlow & Orlow
620 Chestnut Street, Suite 656
Philadelphia, PA  19106
        Counsel for Petitioner

Peter D. Keisler
   Assistant Attorney General
   Civil Division
Christopher C. Fuller
   Senior Litigation Counsel
Linda S. Wernery, Esquire
Lyle D. Jentzer, Esquire
Thankful T. Vanderstar, Esquire (Argued)
U.S. Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, D.C.   20044

        Counsel for Respondent

---

[*]This case was argued before the panel of Judges Ambro, Becker and Stagg.  Judge Becker died before the filing of this opinion.  It is filed by a quorum of the panel.  28 U.S.C. § 46(d).

[**]Honorable Tom Stagg, Senior District Judge for the Western District of Louisiana, sitting by designation.

2

OPINION OF THE COURT

AMBRO, Circuit Judge

Oyenike Alaka petitions for review of a final order of removal issued by the Board of Immigration Appeals ("BIA"). We conclude that the immigration judge ("IJ") erred in finding Alaka ineligible for withholding of removal as a person convicted of a "particularly serious crime," and accordingly we grant her withholding of removal petition and remand to the BIA. We do not have jurisdiction to consider the IJ's conclusion that Alaka abandoned her lawful permanent resident status, and therefore deny her petition for cancellation of removal and relief under former § 212(c) of the Immigration and Nationality Act ("INA").

## I. Factual Background

Alaka is a citizen of Nigeria who entered the United States without inspection in November, 1984. She received permanent resident status on December 1, 1990. When Alaka attempted to reenter the United States in 2001 after a trip abroad, the Immigration and Naturalization Service ("INS")[1]

---

[1]Since March 1, 2003, the INS has been merged into the Department of Homeland Security, and is now called the Bureau of Immigration and Customs Enforcement. However, since the case began as an INS matter, we shall continue to refer to the

denied her admission because she had been convicted of a crime involving moral turpitude. Alaka sought relief from removal by asserting claims of persecution and torture in Nigeria. She was ultimately denied this relief, in part because her numerous trips outside the United States added up to an abandonment of her lawful permanent resident status. There are thus two sets of facts relevant to this petition: Alaka's criminal history and her trips abroad.[2]

In 1992, Alaka was convicted in the United States for aiding and abetting bank fraud in violation of 18 U.S.C. §§ 1344 and 2. She was indicted on three counts for conduct involving fraudulent checks. The sentencing court found the total intended loss to be $47,969. Alaka was convicted, however, on only one count, for which the actual loss was $4,716.68. She argued at sentencing that the finding of intended loss should be based only on the charge for which she was convicted, but the

---

INS.

[2]Because we do not reach the merits of Alaka's persecution and torture claims, we do not provide a detailed description of her experiences in Nigeria. In summary, Alaka is a member of the Yoruba tribe in Nigeria and a Christian. Her husband owned a complex of stores and shops in Lagos, Nigeria, some of which he rented to Ibo and Hausa tribesmen. The Oodua People's Congress ("OPC") is a Yoruba tribal organization that attempts to exercise control over the Yoruba sections of Nigeria. On two occasions, in January and June of 2001, Alaka claims the OPC came to her home and beat her husband for renting property to non-Yorubas.

Court held that her conduct as to all three charges was part of a "common scheme or plan," and thus the loss amount was properly derived from all the charges. Alaka was sentenced to eight months incarceration, and three years supervised release, and was required to pay $4,716.68 in restitution.

Alaka was also convicted and incarcerated twice outside the United States. In 1994, she was convicted in France for a drug-related offense and was sentenced to approximately one and a half years incarceration. In 1998, a Canadian court convicted her of fraud (for over $5,000 Canadian dollars) and unlawful possession and use of a credit card. She received a three-month sentence for the fraud charge and a concurrent thirty-day sentence for the credit card offense. The United States Government was not able to produce a record of conviction for these offenses, and it is uncontested that the exact details of the foreign convictions are unknown.

Since becoming a permanent resident in 1990, Alaka has left the United States on nine occasions. She has taken four trips to Nigeria (one of which included the trip to France that resulted in her 1994 drug conviction), and five trips to Canada. Her longest absences from the United States were twenty-two months she spent abroad from 1994 to 1995 (the bulk of which time was spent incarcerated in France), and her eight-month visit to Nigeria in 2001. During that last trip, Alaka married a Nigerian citizen who is the father of two of her three sons. The events that occurred during that visit were what prompted her to return to the United States and form the basis of her claims for relief now before us.

5

## II. Procedural History

Alaka was detained by the INS on August 8, 2001, when she attempted to reenter the United States. A notice to appear was issued on November 19, 2001, charging her with removability under 8 U.S.C. § 1182(a)(2)(A)(i)(I) as an individual who is ineligible for admission on the basis of a conviction for a crime involving moral turpitude (specifically, aiding and abetting bank fraud).[3] Alaka admitted she was inadmissible as charged,[4] but requested cancellation of removal under 8 U.S.C. § 1229b(a) and relief under former § 212(c) of the INA, 8 U.S.C. § 1182(c) (repealed 1996).[5]

---

[3]Alaka was charged as being inadmissible even though she had lawful permanent resident status because she had been convicted of a crime involving moral turpitude. 8 U.S.C. § 1101(a)(13)(C)( v) ("An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien . . . has committed an offense [involving moral turpitude pursuant to § 1182(a)(2)]").

[4]Alaka does not dispute that aiding and abetting bank fraud is a crime of moral turpitude.

[5]Under this now-repealed provision, deportable aliens who had accrued seven years of lawful permanent residence in the United States could request discretionary relief from deportation by arguing that the equities weighed in favor of their remaining in this country. Section 304(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") repealed § 212(c) relief entirely, replacing it with cancellation

6

In July 2002, the IJ found that the time Alaka spent abroad caused her to abandon her permanent resident status, and she was thus ineligible for cancellation of removal and § 212(c) relief. Had Alaka not abandoned her resident status, the IJ stated he "would have found her eligible, as a matter of law, to apply for discretionary relief of the two applications [cancellation of removal and § 212(c) relief]." Alaka responded that she would apply for withholding of removal pursuant to 8 U.S.C. § 1231(b)(3) and withholding of removal under Article 3 of the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT").[6]

---

of removal under 8 U.S.C. § 1229b. Under the new provision, removal can be cancelled for a lawful permanent resident if he or she has been lawfully admitted for at least five years, has resided in the United States continuously for seven years after having been admitted in any status, and has not been convicted of an aggravated felony. 8 U.S.C. § 1229b(a). However, "§ 212(c) relief remains available for aliens . . . whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of their plea under the law then in effect." *INS v. St. Cyr*, 533 U.S. 289, 326 (2001). We have extended *St. Cyr* to make § 212(c) relief available to aliens who declined a plea offer and went to trial in reliance on the availability of § 212(c) relief. *Ponnapula v. Ashcroft*, 373 F.3d 480, 496 (3d Cir. 2004).

[6]G.A. Res 39/46, U.N. GAOR, 39th Sess., Supp. No. 51, at 197, U.N. Doc. A/39/51 (1984).

In February 2003, the IJ restated his conclusion that Alaka was ineligible for cancellation of removal and 212(c) relief, ruled against her claims for withholding of removal and relief under the CAT, and ordered her removed to Nigeria.[7] Though the IJ found Alaka to be credible, and stated that her experience in Nigeria could support a finding of persecution on the basis of, at least in part, political opinion, the "particularly serious" nature of her bank fraud crime under 8 U.S.C. § 1231(b)(3)(ii) precluded his review of her withholding of removal claim. The IJ also denied Alaka's application for CAT relief because there was no evidence to suggest it was more likely than not that she would be tortured in Nigeria by, or with the acquiescence of, the Nigerian government.

Alaka filed a timely motion for reconsideration with the IJ, challenging the designation of her bank fraud offense as "particularly serious." The IJ denied the motion, stating that "while I do not recall with specificity all of the factors which led me to find [Alaka's] conviction to be a 'particularly serious crime' for purposes of withholding of removal . . ., [Alaka's] brief, well presented as it is, does not convince me that I erred."

Alaka appealed both the removal order and the denial of her motion to reconsider, and the BIA adopted and affirmed both decisions of the IJ with only a brief discussion.

---

[7]IIRIRA eliminated the previous legal distinction between deportation and removal proceedings, and we use the terms interchangeably here. *See Avila-Macias v. Ashcroft*, 328 F.3d 108, 111-12 (3d Cir. 2003).

8

On appeal, Alaka reasserts her claims that she is eligible for cancellation of removal, § 212(c) relief, and withholding of removal.[8]  She has not briefed the CAT claim, and we accordingly consider it waived.  *United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005); *see also Lie v. Ashcroft*, 396 F.3d 530, 532 n.1 (3d Cir. 2005).[9]

### III.  Discussion

### A.  Jurisdiction

Alaka's status as a person convicted of a crime involving moral turpitude raises jurisdictional questions under 8 U.S.C. § 1252(a)(2)(C) and (D) that are typically addressed at the outset of an opinion.  *See, e.g., Ilchuk v. Att'y General*, 434 F.3d 618, 621 (3d Cir. 2006).  Here, however, we first consider whether we have jurisdiction under 8 U.S.C. § 1252(a)(2)(B)(ii) (which

---

[8] We have always retained jurisdiction to determine our own jurisdiction, *Papageorgiou v. Gonzales*, 413 F.3d 356, 357 (3d Cir. 2005), and we review those questions *de novo*. *Valansi v. Ashcroft*, 278 F.3d 203, 207 (3d Cir. 2002).  We likewise apply *de novo* review to any constitutional and legal questions raised by a petitioner. *Ilchuk v. Att'y Gen.*, 434 F.3d 618, 621 (3d Cir. 2006).  "When the BIA defers to an IJ, a reviewing court must, as a matter of logic, review the IJ's decision to assess whether the BIA's decision to defer was appropriate."  *Abdulai v. Ashcroft*, 239 F.3d 542, 549 n.2 (3d Cir. 2001).

[9] Alaka even admits in a footnote in her brief that "the people [Alaka] fears, the OPC, are not state actors as required under the CAT."  Pet.'s Brief at 30 n.10.

precludes review of a decision "the authority for which is specified . . . to be in the discretion of the Attorney General or the Secretary of Homeland Security"), and then move on to evaluate to what extent our jurisdiction is limited by Alaka's moral turpitude conviction pursuant to 8 U.S.C. § 1252(a)(2)(C) and (D) (which limit our review to constitutional questions and questions of law where the petitioner is removable by reason of having committed a crime of moral turpitude).[10]

> 1.      Does 8 U.S.C. § 1252(a)(2)(B)(ii) strip us of jurisdiction over Alaka's withholding of removal claim?

The Government argues that we do not have jurisdiction to consider Alaka's withholding of removal claim in light of 8 U.S.C. § 1252(a)(2)(B)(ii). We disagree. Withholding of removal ("withholding") is a mandatory form of relief from removal "if the Attorney General decides that the alien's life or freedom would be threatened in [the country to which the alien will be deported] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). An alien is ineligible for withholding, however, if, *inter alia*, "the Attorney General decides that . . . the alien, having been convicted by a final

---

[10] As "federal courts are not generally obligated to address jurisdictional issues in any particular order," we accordingly organize our jurisdictional discussion in the manner that best lends itself to the questions in this case. *In re Hechinger Inv. Co. of Del., Inc*., 335 F.3d 243, 250-51 (3d Cir. 2003) (internal quotation marks and citation omitted).

judgment of a particularly serious crime[,] is a danger to the community of the United States." 8 U.S.C. § 1231(b)(3)(B)(ii).[11] This provision specifies that

> an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been

---

[11]The BIA has interpreted this language to mean that a petitioner convicted of a "particularly serious crime" necessarily constitutes a danger to the community. *Matter of Carballe*, 19 I. & N. Dec. 357, 360 (BIA 1986). Every Circuit Court that has considered the question has deferred to the BIA's interpretation pursuant to *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984). *See Mosquera-Perez v. I.N.S.*, 3 F.3d 553, 559 (1st Cir. 1993); *Ahmetovic v. I.N.S.*, 62 F.3d 48, 53 (2d Cir. 1995); *Yousefi v. I.N.S.*, 260 F.3d 318, 327-28 (4th Cir. 2001); *Martins v. I.N.S.*, 972 F.2d 657, 661 (5th Cir. 1992); *Hamama v. I.N.S.*, 78 F.3d 233, 240 (6th Cir. 1996); *Garcia v. I.N.S.*, 7 F.3d 1320, 1323 (7th Cir. 1993); *Kankamalage v. I.N.S.*, 335 F.3d 858, 861 n.2 (9th Cir. 2003); *Al-Salehi v. I.N.S.*, 47 F.3d 390, 396 (10th Cir. 1995); *Crespo-Gomez v. Richard*, 780 F.2d 932, 934 (11th Cir. 1986). Because we conclude that Alaka was not convicted of a "particularly serious crime," we do not consider the BIA's conclusion that no "separate determination of dangerousness " is required.

11

convicted of a particularly serious crime.

Because Alaka was sentenced to fewer than five years for her bank fraud offense, her crime is not automatically designated as "particularly serious." The IJ (acting as agent for the Attorney General) determined she had been convicted of a "particularly serious crime" based on the individual facts of her case. Alaka challenges that determination on appeal, and the Government argues we do not have jurisdiction to review it pursuant to 8 U.S.C. § 1252(a)(2)(B)(ii).

That subsection, added to the INA in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), precludes judicial review of a "decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security" (other than the granting of asylum). 8 U.S.C. § 1252(a)(2)(B)(ii). The "subchapter" to which this section refers is Subchapter II in Chapter 12 of Title 8 of the United States Code, and includes all of the statutory provisions at issue in this case. *See Urena-Tavarez v. Ashcroft*, 367 F.3d 154, 158 (3d Cir. 2004).

We conclude that the exception to eligibility for withholding at 8 U.S.C. § 1231(b)(3)(B)(ii) is not a decision "the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B)(ii). The jurisdiction-stripping language of § 1252(a)(2)(B)(ii) applies not to all decisions the Attorney General is entitled to make, but to

12

a narrower category of decisions where Congress has taken the additional step to specify that the sole authority for the action is in the Attorney General's discretion. Put another way, the Attorney General's general authority to arrive at an outcome through the application of law to facts is distinct from the issue of whether Congress has "specified" that the decision lies in the Attorney General's discretion and is thus unreviewable.[12] As we noted in *Soltane v. U.S. Dept. of Justice*,

> if "discretion" under § 125[2](a)(2)(B)(ii) means
> nothing more than the application of facts to

---

[12]Accordingly, we see no conflict with House Conference Report No. 104-828, stating that "the Attorney General retains the authority to determine other circumstances in which an alien has been convicted of a particularly serious crime, regardless of the length of sentence." H.R. Rep. No. 104-828, at 216 (1996). This report highlights only the uncontested fact that the Attorney General may reach one of multiple possible outcomes and does not suggest that his discretion is "specified" in the statute. We likewise see no conflict with the Attorney General's observation that, "[w]ith respect to aggravated felony convictions for which a lesser sentence has been imposed [,] . . . Congress explicitly empowered the Attorney General to make the relevant determination." *In re Y-L-*, 23 I. & N. Dec. 270, 273 (BIA 2002). We read this to mean only that the Attorney General has the ability to make this determination, not that discretion has been "specified" for purposes of 8 U.S.C. § 1252(a)(2)(B)(ii). Again, the relevant jurisdictional bar applies *only* when the discretion is "specified" in the statute, not in every instance where the Attorney General has the authority to apply the law to the facts of a case.

principles, then it is hard to imagine any action by the Attorney General under the relevant title that would not be deemed discretionary. For example, the substantial evidence standard under which we review many immigration actions contemplates that in some cases there will be a range of acceptable outcomes among which an adjudicator might reasonably choose. 8 U.S.C. § 1252(b)(4)(B).

381 F.3d 143, 148 n.3 (3d Cir. 2004) (internal quotation marks and citations omitted).

"The key to § 1252(a)(2)(B)(ii) lies in its requirement that the discretion giving rise to the jurisdictional bar must be 'specified' by statute." *Id.* at 146. "'Specify' means '[t]o mention specifically,' Black's Law Dictionary 1399 (6th ed. 1990); that is, the language of the statute in question must provide the discretionary authority." *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 689 (9th Cir. 2003); *see also Soltane*, 381 F.3d at 146.

There are two sentences in § 1231(b)(3)(B) that might suggest discretion. First, the provision states that withholding is not available "*if the Attorney General decides* that" one of four conditions is present. (Emphasis added.) One of those conditions is when "the alien . . [has] been convicted . . . of a

14

particularly serious crime." 8 U.S.C. § 1231(b)(3)(B)(ii).[13] Second, it directs that the Attorney General is not precluded from "determining" that an alien has been convicted of such a crime, regardless of the length of the sentence imposed. *Id.*

The terms "decide[]" or "determin[e]" are not, standing alone, sufficient to "specify" discretion. Indeed, we have exercised jurisdiction over another of the four conditions that the "Attorney General decides." In *McAllister v. Att'y Gen.*, 444 F.3d 178, 189 (3d Cir. 2006), we exercised jurisdiction over whether the BIA erred in denying withholding on the ground that "the alien is a danger to the security of the United States."[14]

---

[13]The three other conditions, not applicable in this case, are

> (i) the alien ordered, incited, assisted, or otherwise participated in the persecution of an individual because of the individual's race, religion, nationality, membership in a particular social group, or political opinion; . . . (iii) there are serious reasons to believe that the alien committed a serious nonpolitical crime outside the United States before the alien arrived in the United States; or (iv) there are reasonable grounds to believe that the alien is a danger to the security of the United States.

8 U.S.C. § 1231(b)(3)(B).

[14]Jurisdiction was not explicitly discussed in *McAllister*, but, in light of our "inherent obligation to satisfy ourselves that appellate jurisdiction attaches," we consider the evaluation of

15

8 U.S.C. § 1231(b)(3)(B)(iv). As with the "particularly serious crime" condition, the Attorney General "decides" this question, which in turn depends on his "determin[ation] that an alien has engaged in terrorist activities." *McAllister*, 444 F.3d at 189 (citing 8 U.S.C. § 1231(b)(3)(B)). That language, however, did not preclude our review of the Attorney General's decision to deny withholding. *Id.*

We have likewise reviewed the merits of a petitioner's objection to the designation of his claim as frivolous, another condition that "the Attorney General determines." *Muhanna v. Gonzales*, 399 F.3d 582, 589 (3d Cir. 2005) (finding due process violation in designation of claim as frivolous pursuant to 8 U.S.C. § 1158(d)(6)).[15] Similarly, we regularly exercise jurisdiction over the question of agency error in denying withholding for failure to support the claim, even though this too is something the Attorney General "decides." *See, e.g., Ilchuk*, 434 F.3d at 624 (citing 8 U.S.C. § 1231(b)(3)(A) and reversing

---

the merits as evidence of an implicit conclusion that jurisdiction exists. *Adapt of Phila. v. Phila. Hous. Auth.*, 433 F.3d 353, 361 n.10 (3d Cir. 2006).

[15] 8 U.S.C. § 1158(d)(6) provides:

> If the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph (4)(A), the alien shall be permanently ineligible for any benefits under this chapter, effective as of the date of a final determination on such application.

16

BIA's denial of withholding when that relief is available only "if the Attorney General *decides* that the alien's life or freedom would be threatened . . . .") (emphasis added).

By way of contrast, Congress knows how to "specify" discretion and has done so repeatedly in other provisions of the INA. Within the category of "[d]enials of discretionary relief" at § 1252(a)(2)(B), subsection (i) precludes review over discretionary decisions in five enumerated sections of the INA, each of which refers explicitly to discretion.[16] Moreover, there are no less than thirty-two additional provisions in the very subchapter of the INA referenced by 8 U.S.C. § 1252(a)(2)(B)(ii) that make explicit the grant of "discretion" to the Attorney General or the Secretary of Homeland Security.[17]

---

[16]*See* 8 U.S.C. § 1182(h) and (h)(2) ("[t]he Attorney General may, in his discretion") ("the Attorney General, in his discretion); 8 U.S.C. § 1182(i) ("[t]he Attorney General may, in the discretion of the Attorney General"); 8 U.S.C. § 1229b(b)(2)(D) ("within the sole discretion of the Attorney General"); 8 U.S.C. § 1229c ("in the discretion of the Attorney General"); and 8 U.S.C. § 1255 ("by the Attorney General, in his discretion") ("in the sole discretion of the Attorney General").

[17]*See* 8 U.S.C. § 1103(a)(5)(he "shall, in his discretion, appoint . . . employees"); 8 U.S.C. § 1157(c)(1) ("the Attorney General may, in the Attorney General's discretion "); 8 U.S.C. § 1159(b) ("in the [Homeland Security] Secretary's or the Attorney General's discretion"); 8 U.S.C. § 1181(b) ("the Attorney General in his discretion"); 8 U.S.C. §

17

1182(a)(3)(D)(iv) ("[t]he Attorney General may, in the Attorney General's discretion"); 8 U.S.C. § 1182(a)(9)(B)(v) ("[t]he Attorney General has sole discretion "); 8 U.S.C. § 1182(d)(1) ("[t]he Attorney General, in the Attorney General's discretion"); 8 U.S.C. § 1182(d)(3)(A) ("in the discretion of the Attorney General"); 8 U.S.C. § 1182(d)(5)(A) ("in his discretion"); 8 U.S.C. § 1182(d)(11) ("[t]he Attorney General may, in his discretion"); 8 U.S.C. § 1182(d)(12) ("[t]he Attorney General may, in the discretion of the Attorney General"); 8 U.S.C. § 1182(g)(1) ("in the discretion of the Attorney General"); 8 U.S.C. § 1182(g)(3) ("in the discretion of the Attorney General"); 8 U.S.C. § 1183 ("in the discretion of the Attorney General"); 8 U.S.C. § 1184(c)(6)(F) ("as the Attorney General determines, in his sole discretion"); 8 U.S.C. § 1184(d)(1) ("the Secretary of Homeland Security in his discretion"); 8 U.S.C. § 1186a(c)(4) ("in the Attorney General's discretion"); 8 U.S.C. § 1186a(d)(3) ("in the Attorney General's discretion"); 8 U.S.C. § 1203(b) ("the Attorney General may, in his discretion"); 8 U.S.C. § 1225(a)(4) ("in the discretion of the Attorney General"); 8 U.S.C. § 1225(b)(1)(A)(iii)(I) ("in the sole and unreviewable discretion of the Attorney General"); 8 U.S.C. § 1227(a)(1)(E)(iii) ("[t]he Attorney General may, in his discretion"); 8 U.S.C. § 1227(a)(1)(H) ("in the discretion of the Attorney General"); 8 U.S.C. § 1227(a)(7)(B) ("the sole discretion of the Attorney General"); 8 U.S.C. § 1259 ("in the discretion of the Attorney General"); 8 U.S.C. § 1281(a) ("in the discretion of the Attorney General"); 8 U.S.C. § 1281(c) ("in the discretion of the Attorney General"); 8 U.S.C. § 1286 ("in the discretion of the Attorney General"); 8 U.S.C. § 1302(c) ("[t]he Attorney General may, in his discretion"); 8 U.S.C. § 1305(b) ("[t]he Attorney General may in his discretion"); 8 U.S.C. § 1321(a) ("in the discretion of the Attorney General"); 8

18

"It is a fundamental canon of statutory construction that where sections of a statute do not include a specific term used elsewhere in the statute, the drafters did not wish such a requirement to apply." *United States v. Mobley*, 956 F.2d 450, 452-53 (3d Cir. 1992). If Congress had wanted to specify the discretion to make the "particularly serious" determination, it would have employed the same explicit language used in other provisions of the same statute. *Cf. Spencer Enters., Inc.*, 345 F.3d at 689.

Although the explicit use of language granting discretion – such as "the Attorney General may, in his discretion" – would presumably trigger the application of § 1252(a)(2)(B)(ii), the jurisdictional bar might still apply even in the absence of that language. Indeed, the three cases from our Court analyzing the application of § 1252(a)(2)(B)(ii) to other agency determinations that were allegedly unreviewable have not relied exclusively, or even primarily, on the presence or absence of the word "discretion." On the one hand, in *Soltane*, we held that a preference visa determination under 8 U.S.C. § 1153(b)(4)[18] was

---

U.S.C. § 1330(a) ("in the discretion of the Attorney General"); and 8 U.S.C. § 1353 ("within the discretion . . . of the Attorney General").

[18] 8 U.S.C. § 1153(b)(4) provides:

Visas *shall* be made available, in a number not to exceed 7.1 percent of such worldwide level, to qualified special immigrants described in section 1101(a)(27) of this title (other than those described in subparagraph (A) or (B) thereof), of

19

not a decision "the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security" when: (a) the definition for the term in question was "fairly detailed and specific[;]" (b) there was "no explicit reference to 'discretion;'" and (c) the statute instructs that "the visa 'shall' issue if those requirements are met." 381 F.3d at 147.

In contrast, in *Jilin Pharm. USA, Inc. v. Chertoff*, 447 F.3d 196 (3d Cir. 2006), we held that the discretion to revoke a visa[19] has been "specified" sufficiently to bar our review when: (a) the statute states the Secretary of Homeland Security "may" (rather than "shall") revoke approval of a visa petition; (b) the statute states that approval may be revoked "at any time," language that "connotes a level of discretion;" (c) the only arguable limit on discretion, the requirement of "good and sufficient cause," was itself committed to the Secretary's

> which not more than 5,000 may be made available in any fiscal year to special immigrants described in subclause (II) or (III) of section 1101(a)(27)(C)(ii) of this title, and not more than 100 may be made available in any fiscal year to special immigrants, excluding spouses and children, who are described in section 1101(a)(27)(M) of this title.

(emphasis added).

[19]8 U.S.C. § 1155 provides that "[t]he Secretary of Homeland Security may, at any time, for what he deems to be good and sufficient cause, revoke the approval of any petition approved by him under section 1154 of this title."

discretion; and (d) the cause requirement, that petitioners asserted limited discretion, was "so subjective as to provide no meaningful legal standard." *Id*. at 203-05.

Similarly, in *Urena-Tavarez* we found that a hardship waiver determination under 8 U.S.C. § 1186a(c)(4)[20] is a decision "the authority for which is specified . . . to be in the discretion of the Attorney General." 367 F.3d at 161. This is because, in addition to the fact that the statute uses the language "in the Attorney General's discretion," it: (a) states the Attorney General "may" (rather than "shall") grant a waiver; and (b) adds "another layer of protection from review" by giving the Attorney General "sole discretion" to decide "what evidence is credible and the weight" to give it. *Urena-Tavarez*, 367 F.3d at 159-60.

In our case, the determination of a "particularly serious offense" is more like the decision considered in *Soltane*, and less like the ones in *Jilin* and *Urena-Tavarez*, for the following reasons. First, there is no explicit reference in § 1231(b)(3)(B)(ii) to the Attorney General's "discretion" to make the determination, and certainly no added "layer of protection from review" in the form of an additional explicit

---

[20] 8 U.S.C. § 1186a(c)(4) provides that "[t]he Attorney General, *in the Attorney General's discretion*, *may* remove the conditional basis of the permanent resident status for an alien . . . . The determination of what evidence is credible and the weight to be given that evidence *shall be within the sole discretion of the Attorney General*."
(emphases added).

reference to the Attorney General's discretion. *Soltane* found the absence of such explicit language persuasive, 381 F.3d at 147 (noting "no explicit reference to 'discretion' as in *Urena-Tavarez*"), just as the presence of such language was critical in *Urena-Tavarez.* 367 F.3d at 159-60.

Second, *Soltane*, *Jilin* and *Urena-Tavarez* each focus on the import of either "shall" or "may." *Soltane*, 381 F.3d at 147 (we have jurisdiction when, *inter alia*, statute instructs that "the visa 'shall' issue if those requirements are met"); *Jilin*, 447 F.3d at 203 ("language [that Attorney General *may* revoke approval] is indicative of administrative discretion for purposes of § 1252(a)(2)(B)(ii)" (emphasis in original))*; Urena-Tavarez*, 367 F.3d at 160 (no jurisdiction when, *inter alia*, statute instructs that the Attorney General "may" grant a waiver when certain legal requirements are met). The exception contained at 8 U.S.C. § 1231(b)(3)(B) does not use "may," and instead says the mandatory bar on removal "does not apply to an alien" if the Attorney General determines one of four factors is present. The provision mandates a particular outcome once a determination has been made. It is thus more like "shall" than "may," and more like the statute in *Soltane*, 381 F.3d at 147, over which we exercised jurisdiction.[21]

---

[21] We note that in *Chong v. Dist. Dir., I.N.S.*, we stated that § 1231(b)(3)(B) "grants the Attorney General discretion to determine whether that alien has committed a 'particularly serious crime.'" 264 F.3d 378, 387 (3d Cir. 2001). *Chong* merely notes that the Attorney General has the authority to make the decision, not that the discretion to do so has been "specified" in the statute. *Id.* Furthermore, we discussed in *dicta* the

22

Third, our Court has observed that "the question of whether discretionary authority has been specified by statute should be considered by examining the statute as a whole." *Soltane*, 381 F.3d at 147. Withholding of removal pursuant to 8 U.S.C. § 1231(b)(3) is a *mandatory* prohibition against removal when certain facts are present. As the statute instructs, "the Attorney General *may not* remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened . . . ." 8 U.S.C. 1231(b)(3)(A) (emphasis added). *See, e.g.*, *Wang v. Att'y Gen.*, 423 F.3d 260, 270 n.4 (3d Cir. 2005) (regarding "exercise of discretion with respect to [petitioner's] asylum claim, there is no analogue to this discretion in the context of mandatory withholding relief"). Any evaluation of the "discretionary" nature of the "particularly serious crime" determination should be conducted in light of the mandatory character of withholding.

Finally, and most importantly, the statutes found to specify discretion in *Jilin* and *Urena-Tavarez* contain language that serves to elevate the decision – out of the broader class of determinations the Attorney General is entitled to make – into the narrower category of decisions where discretion has been "specified." As described above, the language of the statute in *Urena-Tavarez* made the judicial intent to preclude judicial review "not merely fairly discernible, [but] express and manifest." 367 F.3d at 158 (internal quotation marks omitted).

---

consequences "if we reversed the Board's finding that [petitioner] committed a 'particularly serious crime," suggesting jurisdiction to do so. *Id*. at 385-86.

23

Indeed, the statute specifies that the decision to issue a hardship waiver is "in the Attorney General's discretion" and additionally grants discretion over evidentiary decisions. *Id.* at 159-60. Similarly, in *Jilin*, the statute specified that the revocation decision can be made "at any time," and "for what [the Secretary of Homeland Security] deems to be a good and sufficient cause." 447 F.3d at 203. We concluded that particular terminology indicates that the decision "is solely vested in the Secretary's discretion." *Id.* at 204. In sharp contrast, the statute before us contains no amplifying language. It merely grants the Attorney General the ability to "decide[]" that an alien's offense is "particularly serious," and allows him to "determin[e]" that "notwithstanding the length of the sentence." 8 U.S.C. § 1231(b)(3)(B).

We note that our conclusion threatens to bring us into conflict with the Ninth Circuit Court of Appeals, the only other Circuit Court to address this question squarely in a precedential opinion.[22] In 2001 – prior to the passage of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 (2005) ("REAL ID Act"), discussed in more detail in the next section – the Ninth Circuit held it did not have jurisdiction to review a "particularly serious crime" decision because it was "based upon an exercise of the BIA's discretion." *Matsuk v. INS*, 247 F.3d 999, 1002

---

[22]The Sixth Circuit Court of Appeals has issued an unpublished decision holding that "as to the initial question of whether the alien committed a serious crime . . . [,] we lack jurisdiction to review the BIA's discretionary determination." *Celaj v. Ashcroft*, 121 Fed. Appx. 608, 611 (6th Cir., Jan. 31, 2005).

(9th Cir. 2001). The Court subsequently reaffirmed this holding in two other pre-REAL ID Act cases. *Spencer Enters., Inc.*, 345 F.3d at 690 ("[u]nder the language of the statute, this decision [on withholding of removal] is left entirely to the discretion of the Attorney General, with no governing statutory standards"); *Unuakhaulu v. Gonzales*, 416 F.3d 931, 935 (9th Cir. 2005) ("[W]hen the Attorney General decides that the alien's offense was a 'particularly serious crime,' § 1231(b)(3)(B), we lack jurisdiction to review such a decision because it is discretionary.").[23]

In a recent decision, however, that takes the REAL ID Act into account, the Ninth Circuit minimized the effect of the jurisdictional bar established in *Matsuk*. In *Afridi v. Gonzales*, 442 F.3d 1212, 1218 (9th Cir. 2006), the Court held that "the BIA's interpretation of the term 'particularly serious crime' [is] a question of law" over which it could exercise jurisdiction pursuant to § 1252(a)(2)(D). It stated that, "[w]hile we cannot reweigh evidence to determine if the crime was indeed particularly serious, we can determine whether the BIA applied the correct legal standard in making its determination." *Id.* Thus, the petitioner's claim that the BIA had "failed to engage in a case-specific analysis" in determining that his crime was "particularly serious" – in contrast to a claim on the merits of the decision – was one over which the Court could exercise

---

[23]*Unuakhaulu* is identified as a pre-REAL ID Act case because it was filed on December 20, 2004, although the opinion was amended on July 18, 2005 and the order was amended on August 4, 2005. The case, however, does not mention either the REAL ID Act or § 1252(a)(2)(D).

25

jurisdiction.  *Id*. at 1220.

In addition, we take note of two Seventh Circuit Court of Appeals cases stating in *dicta* that courts of appeals may exercise jurisdiction over the determination whether an offense is "particularly serious."  In *Bosede v. Ashcroft*, 309 F.3d 441 (7th Cir. 2002), the Court decided there was no jurisdiction to consider the petitioner's claim when he had not raised it before the IJ or BIA, but it considered whether the IJ's designation of an offense as a "particularly serious" crime was correct.  309 F.3d at 447-48 (petitioner "may well have been prejudiced by the IJ and BIA determinations that he committed a 'particularly serious crime' . . . [, but] he must present the facts that underlie his claim to the agency before this court can do anything").  Next, in *Ali v. Ashcroft*, 395 F.3d 722, 730 (7th Cir. 2005), the Court considered the petitioner's claim that his crime was not "particularly serious," but concluded

> [a]s to the question of whether Ali has rebutted the presumption that his conviction was for a "particularly serious crime," we find he has not exhausted his administrative remedies on this point.  Ali has not presented his arguments to the BIA, and we cannot review these arguments now in the first instance.

395 F.3d at 730.  Both of these cases imply that the Seventh Circuit Court would have exercised jurisdiction over the "particularly serious crime" question had the petitioners properly argued their claims at the agency level.

"The Supreme Court has held that only a showing of 'clear and convincing evidence' is sufficient to support a finding that Congress intended to preclude judicial review of an administrative action." *Urena-Tavarez,* 367 F.3d at 158 (quoting *Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991)). We do not find "clear and convincing evidence" of that intent in light of the use of "specified" in § 1252(a)(2)(B)(ii), the failure of Congress to specify the Attorney General's discretion in § 1231(b)(3)(B)(ii) as it did in other provisions of the same subchapter, the factors our Court has considered relevant in determining whether discretion is specified, and the mandatory nature of withholding of removal. We therefore conclude that the words "decide[]" and "determin[e]," without any other indication that these words "specif[y]" discretion to the Attorney General, are insufficient to pull the "particularly serious crime" determination out from the broad class of reviewable decisions that require the application of law to fact into the narrower class of decisions where judicial review is precluded by § 1252(a)(2)(B)(ii).

## 2. Is our jurisdiction precluded by 8 U.S.C. § 1252(a)(2)(C)?

The second jurisdictional question in this case arises from 8 U.S.C. § 1252(a)(2)(C), which divests courts of "jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense," including, *inter alia*, "a crime involving moral turpitude." 8 U.S.C. § 1182(a)(2)(A)(i)(I). It is uncontested that the jurisdiction-stripping language of § 1252(a)(2)(C) applies to

27

Alaka.[24]  A disputed question nonetheless remains – whether 8 U.S.C. § 1252(a)(2)(D) applies to restore jurisdiction over at least some of her claims.

Section 1252(a)(2)(D) was added by § 106(a)(1)(A)(iii) of the REAL ID Act, and states that no limitations or prohibitions on judicial review "shall be construed as precluding review of constitutional claims or questions of law."[25]  Our

---

[24]Alaka does not contend that aiding and abetting bank fraud is not a crime of moral turpitude.  Moreover, we conclude that § 1252(a)(2)(C) limits our jurisdiction here, even though the statute appears to apply only to an alien who is *removable* by reason of having committed a crime of moral turpitude and Alaka was actually charged as being *inadmissible* for having done the same.  This discrepancy is clarified by the section of the INA governing removal proceedings, which states that "[a]n alien placed in proceedings under this section may be charged with any applicable ground of inadmissibility under section 1182(a) of this title [including crimes involving moral turpitude]."  8 U.S.C. § 1229a(a)(2).  Put another way, inadmissibility is simply another form of removability.  *See Balogun v. Ashcroft*, 270 F.3d 274, 279 (5th Cir. 2001) ("if an alien is *inadmissible* for having committed offenses specified in § 1182(a), he is *removable* as well") (emphasis in original); *see also Vuksanovic v. Att'y Gen.*, 439 F.3d 1308, 1310 (11th Cir. 2006) (citing § 1252(a)(2)(C) as a jurisdictional limit for claims by alien who is "inadmissible or removable by reason of having committed a crime involving moral turpitude").

[25] Section 1252(a)(2)(D), which allows consideration of legal and constitutional questions, also serves as an exception to the

28

Court has defined the latter to include "pure questions of law, and . . . issues of application of law to fact, where the facts are undisputed and not the subject of challenge." *Kamara v. Att'y Gen.*, 420 F.3d 202, 211 (3d Cir. 2005) (internal quotation marks and citations omitted). Thus, "despite the changes of the REAL ID Act, factual or discretionary determinations continue to fall outside [our] jurisdiction." *Sukwanputra v. Gonzales*, 434 F.3d 627, 634 (3d Cir. 2006). The Government argues that Alaka "has not raised either a constitutional or a legal claim sufficient to trigger the REAL ID Act's exception to the jurisdictional bar." Resp.'s Brief at 6. Alaka insists, as she must, that each of her claims for relief satisfies the exception. We therefore need to determine, as to each claim, whether it involves a constitutional or legal question over which we have jurisdiction, and only then may we analyze the merits.

### (a)  abandonment of lawful permanent resident status

Alaka challenges the IJ's determination that she was ineligible for possible relief under former § 212(c) of the INA, and cancellation of removal under 8 U.S.C. § 1229b, on the ground that she had abandoned her lawful permanent resident status, a prerequisite for both forms of relief. *See* 8 U.S.C. § 1229b(a)(1) (to be eligible for cancellation, alien must be "lawfully admitted for permanent residence for not less than 5 years") and 8 C.F.R. § 212.3(f)(2) (to be considered for § 212(c) relief alien must have "maintained lawful domicile in the United

---

jurisdictional limits imposed by § 1252(a)(2)(B).

States . . . as . . . a lawful permanent resident . . . for at least seven consecutive years immediately preceding the filing of the application").

Alaka claims that the conclusion that she abandoned her permanent legal resident status is based on legal error, and the Government argues it is a factual question that we do not have jurisdiction to review. In this particular context, we agree with the Government. The basic test for evaluating whether a lawful permanent resident has abandoned that status by virtue of traveling abroad is "whether [the petitioner's] extended trips [outside the United States] constitute 'temporary visits abroad.'" *Singh v. Reno*, 113 F.3d 1512, 1514 (9th Cir. 1997); *see also Moin v. Ashcroft*, 335 F.3d 415, 419 (5th Cir. 2003); *Ahmed v. Ashcroft*, 286 F.3d 611, 612-13 (2d Cir. 2002). A trip is "temporary" if it is (1) "relatively short," or (2) if not short, the petitioner had "a continuous, uninterrupted intention to return to the United States during the entirety of his visit." *Singh*, 113 F.3d at 1514 (internal quotation marks and citations omitted). As to intent, "[t]he issue is not whether the petitioner had the intent to return ultimately, but the intent to return to the United States within a relatively short period." *Id.*

Here, Alaka's trips abroad (lasting up to twenty-two months) were not short; thus, the critical issue was whether she had the requisite uninterrupted intent to return to the United States. Determining a petitioner's intent is a fact-based inquiry. *See Katebi v. Ashcroft*, 396 F.3d 463, 466 (1st Cir. 2005) (considering "fact-intensive question of whether [the petitioner] abandoned his permanent residence status"); *Khodagholian v. Ashcroft*, 335 F.3d 1003, 1006 (9th Cir. 2003) ("[w]hether [the

30

petitioner] abandoned his [permanent residence status] is an intrinsically fact-specific question"); *Chavez-Ramirez v. I.N.S.*, 792 F.2d 932, 934 (9th Cir. 1986) ("BIA's conclusions concerning an alien's intent are essentially factual"). We do not have jurisdiction to review the merits of the IJ's factual conclusion here, and accordingly dismiss Alaka's petition as to her claims for cancellation of removal and § 212(c) relief.[26]

### (b) "particularly serious crime" determination

We do, however, have jurisdiction over Alaka's challenge to the denial of withholding of removal. She has raised a question of law by asserting that the IJ made a legal error in determining that her crime was "particularly serious." Specifically, she claims the IJ erred because an offense must be an aggravated felony to qualify as a "particularly serious crime," and her conviction for bank fraud does not constitute an

---

[26]We emphasize that we may not exercise jurisdiction over this issue because it would require review of the IJ's *factual* determination; our jurisdiction is not barred merely because cancellation of removal is a *discretionary* form of relief. *See Cruz v. Att'y Gen.*, --- F.3d ----, No. 05-2764, 2006 WL 1687393, *8 (3d Cir., June 21, 2006) (holding that "we would have jurisdiction to review the BIA's decision" that the petitioner was "ineligible . . . for *sua sponte* relief"); *Pinho v. Gonzales*, 432 F.3d 193, 203-04 (3d Cir. 2005) (distinguishing between unreviewable decision to grant discretionary relief and reviewable decision that alien is legally ineligible for discretionary relief).

31

aggravated felony. In other words, she claims the IJ applied the wrong legal standard and erroneously classified her offense as an aggravated felony. Whether an IJ applied the correct legal standard is a question of law. *See, e.g., Afridi*, 442 F.3d at 1218 (argument that "BIA failed to apply the proper legal standard . . . . raises a question of law). Whether a petitioner has been convicted of an aggravated felony is also a legal question. *Ng v. Att'y Gen.*, 436 F.3d 392, 394-95 (3d Cir. 2006). We thus have jurisdiction over whether the IJ misapplied the law in determining whether Alaka's bank fraud conviction was "particularly serious."

### B. Merits

Having established our jurisdiction to consider Alaka's legal questions regarding the designation of her offense as "particularly serious," we now tackle the merits. Alaka contends an offense cannot be "particularly serious" if it is not an aggravated felony and her offense was not; thus the IJ's "particularly serious" designation was a legal error. We consider each part of this argument in turn.

### 1. Does an offense have to be an aggravated felony to be "particularly serious"?

Alaka insists that to be eligible for classification as a "particularly serious crime," an offense must be an aggravated felony as defined in the INA at 8 U.S.C. § 1101(a)(43). This is an issue of first impression in our Circuit, and we conclude that Alaka is correct. The plain language and structure (*i.e.*, context) of the statute indicate that an offense must be an

32

aggravated felony to be sufficiently "serious."  "Perhaps the most fundamental principle of statutory construction is that words in a statute must be given their ordinary meaning whenever possible." *Okeke v. Gonzales*, 407 F.3d 585, 593 (3d Cir. 2005).  Moreover, "[i]n matters of statutory interpretation, the 'plain meaning' of statutory language is often illuminated by considering not only 'the particular statutory language' at issue, but also the structure of the section in which the key language is found, 'the design of the statute as a whole and its object . . . . ' " *United States v. Tupone*, 442 F.3d 145, 151 (3d Cir.  2006) (citing *United States v. Schneider*, 14 F.3d 876, 879 (3d Cir. 1994)); s*ee also Zheng v. Gonzales*, 422 F.3d 98, 116 (3d Cir. 2005) (expressly looking to the text and structure of a statute to discern Congressional intent); *M.A. ex rel. E.S. v. State-Operated Sch. Dist. of the City of Newark*, 344 F.3d 335, 348 (3d Cir. 2003) (it would be a mistake to "squint[ ] myopically" at the phrase in question and interpret it in isolation, rather than in the context of the "text and structure" of the statute as a whole).  The Supreme Court has consistently endorsed this view as well.  *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 289 n.7 (2001) ("interpretive inquiry begins with the text and structure of the statute"); *see also City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 127 (2005) (Breyer, J., concurring) ("context, not just literal text, will often lead a court to Congress' intent in respect to a particular statute").

Here, the text and structure of the statute suggest that an offense must be an aggravated felony to be "particularly serious."  For ease of reference, we repeat the text of 8 U.S.C. § 1231(b)(3)(B):

33

> [A]n alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

The second sentence, authorizing the Attorney General to determine when a conviction is "particularly serious," is clearly tied to the first; it explicitly refers back to the "previous sentence," and accordingly implies that it is limited to aggravated felonies. *Cf. United States v. McLaughlin*, 164 F.3d 1, 20 (D.C. Cir. 1998) (holding that "[b]y using the word 'thus,' the Court clearly linked its reference [in the second sentence] to the previous sentence's discussion").

We therefore conclude that an offense must be an aggravated felony in order to be classified as a "particularly serious crime." *See Chong,* 264 F.3d at 387 (describing "particularly serious" determination in the context "where a court has sentenced an alien to less than five years *for an aggravated felony*") (emphasis added); *Afridi*, 442 F.3d at 1220 n.4 (referring to the determination of "whether *aggravated felony convictions* resulting in sentences of less than five years are particularly serious crimes") (emphasis added); *Acero v. INS*, No. Civ. A. 04-1223 (DGT), 2005 WL 615744 *8 n.4 (E.D.N.Y. Mar. 16, 2005) ("Particularly serious crimes are a

34

subset of aggravated felonies, as defined by the statute.").

2.    Was Alaka's offense an aggravated felony?

Alaka alleges that the IJ's conclusion that her conviction was for an aggravated felony was incorrect. She asserts that the IJ improperly relied on the sentencing report and used the wrong loss amount in making his determination. While we conclude that the IJ properly considered the factual findings in the sentencing report, we agree with Alaka that the loss amount tied to the dismissed charges was improperly considered as part of the aggravated felony analysis.[27]

---

[27]Our analysis does not track exactly the decision making process of the IJ because of the manner in which Alaka's case unfolded. In an earlier hearing, the IJ concluded that Alaka had been convicted of an aggravated felony, on the ground that the intended loss was more than $10,000. His consideration of the sentencing report was conducted in the context of the "particularly serious" determination, not the aggravated felony analysis. In other words, the IJ determined the loss amount was over $10,000 in one context, and then addressed in detail the question of multiple victims, multiple charges and the total loss amount in a separate discussion of the "particularly serious" nature of her conduct. We have imported the IJ's consideration of the sentencing memorandum *from* the "particularly serious" discussion *into* the aggravated felony analysis because each requires analysis of some of the same factors.

35

Alaka was convicted of violating 18 U.S.C. §§ 1344 (bank fraud) and 2 (aiding and abetting). Section 1344 states a person is guilty of bank fraud if he or she

> knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

The INA defines "aggravated felony" to include an offense that "involves fraud or deceit in which the loss to the victim or victims exceeds $10,000." 8 U.S.C. § 1101(a)(43)(M)(i).[28] Alaka concedes that her bank fraud offense involves fraud, but she challenges the IJ's determination that the loss exceeded $10,000.

When evaluating whether an offense is an aggravated felony, we presumptively apply the categorical approach. *Francis v. Reno*, 269 F.3d 162, 171 (3d Cir. 2001). This approach prohibits consideration of evidence other than the statutory definition of the offense, thus not taking into account the particular facts underlying a conviction. *Singh v. Ashcroft*, 383 F.3d 144, 147-48 (3d Cir. 2004). However, "the formal

---

[28]Section 1101(a)(43)(U) of the INA provides that the term "aggravated felony" also includes "an attempt or conspiracy to commit an offense described in (section 101(a)(43))."

36

categorical approach properly may be abandoned . . . when the terms of the statute on which removal is based invites inquiry into the facts of the underlying conviction." *Knapik v. Ashcroft*, 384 F.3d 84, 92 n.8 (3d Cir. 2004).

We have already determined that 8 U.S.C. § 1101(a)(43)(M)(i) invites further inquiry because it specifies a mandatory loss amount. *Nugent v. Ashcroft*, 367 F.3d 162, 175 (3d Cir. 2004). Furthermore, our Court has held that "[t]he record of conviction includes the indictment, plea, verdict, and sentence." *Partyka v. Att'y Gen.*, 417 F.3d 408, 416 (3d Cir. 2005) (internal quotation marks and citations omitted). We may also consider "any explicit factual findings by the trial judge." *Shepard v. United States*, 544 U.S. 13, 16 (2005). Thus, the IJ did not err in examining the District Court's factual findings as articulated in the sentencing report.

That said, we hold it was legal error for the IJ to consider the amount of intended loss for all of the charges rather than the single count for which she was convicted.[29] In reaching our

---

[29]We review this question of law *de novo*, *Ilchuk*, 434 F.3d at 621, though not without considering whether the BIA's or IJ's "interpretation and application of immigration law [are] subject to deference under the principles of *Chevron*." *Paripovic v. Gonzales*, 418 F.3d 240, 244 n.4 (3d Cir. 2005). As our Court has explained:

> Under *Chevron* . . . we review an agency's construction of a statute it administers under a two-step inquiry. If congressional intent is clear

37

conclusion, we find the opinions of our sister Circuit Courts instructive.  The Seventh, Ninth and Tenth Circuits have each been faced with cases where, as here, the petitioner had pled guilty to bank fraud in violation of 18 U.S.C. § 1344, the INS argued that the offense was an aggravated felony under 8 U.S.C. § 1101(a)(43)(M)(I), and the court had to determine whether conduct underlying dismissed charges could be considered in deciding this issue.  *Knutsen v. Gonzales*, 429 F.3d 733 (7th Cir. 2005); *Khalayleh v. INS*, 287 F.3d 978 (10th Cir. 2002); *Chang v. INS*, 307 F.3d 1185 (9th Cir. 2002).  Our agreement

> from the statute's language, we must give effect to it as written.  If Congress's intent is silent or ambiguous, we must decide if the agency's action is based on a permissible construction of the statute.

*Knapik*, 384 F.3d at 87 (internal quotation marks and citations omitted).  Thus deference is inappropriate when Congress has "directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842; *see also Mendez-Reyes v. Att'y Gen.*, 428 F.3d 187, 191 (3d Cir. 2005).  "If Congress has done so, the inquiry is at an end; the court 'must give effect to the unambiguously expressed intent of Congress.' " *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132  (2000) (quoting *Chevron*, 467 U.S. at 843).  As explained below, we find that 8 U.S.C. § 1101(a)(43)(M)(I) is unambiguous and we therefore need not defer to the IJ's interpretation.  *See Knutsen v. Gonzales*, 429 F.3d 733, 736 (7th Cir. 2005) (holding that  8 U.S.C. § 1101(a)(43)(M)(I) is unambiguous); *Khalayleh v. INS*, 287 F.3d 978, 980 (10th Cir. 2002) (same); *Chang v. INS*, 307 F.3d 1185,1188 (9th Cir. 2002) (same).

with the analysis in these cases leads us to reach the following conclusions.

First, "the plain and unambiguous language of the statute . . . predicates removal on a *convicted* offense resulting in losses greater than \$10,000." *Knutsen*, 429 F.3d at 736 (citing 8 U.S.C. §§ 1227(a)(2)(A)(iii), 1101(a)(43)(M)(I)) (emphasis in original)). As the Seventh Circuit concluded, "[t]his plain language forecloses inclusion of losses stemming from unconvicted offenses." *Id*. at 736-37; *see also Chang*, 307 F.3d at 1190 (holding that "the \$10,000 loss requirement" of 8 U.S.C. § 1101(a)(43)(M)(I) cannot be divorced from the "conviction requirement"). A focus on the conduct that resulted in a conviction is thus our analytical starting point.

Second, in light of the statute's focus on a "conviction," it is the plea agreement that controls our analysis here. In other words, because it is the *plea agreement* that establishes the offense for which the defendant will be *convicted*, it is to that agreement, and not the indictment or the sentence, that we look in determining the intended loss. We find the logic of *Chang* particularly persuasive on this point. In that case*,* Chang had been charged with 14 counts of bank fraud, "each count corresponding to a bad check that he allegedly passed." 307 F.3d at 1187. In his plea agreement, Chang agreed that his restitution should fall within the \$20,000 to \$40,000 range, and he was ultimately ordered to pay over \$32,000, an amount that was based on "numerous other alleged fraudulent transactions to which Chang did not plead guilty." *Id*. at 1188. The agreement, however, specified that Chang was pleading guilty to a single count for which the loss to the victim was \$605.30.

39

*Id*. at 1187.  The Ninth Circuit concluded that

> [t]he written plea agreement between Chang and
> the government prevents the INS from treating
> Chang's bank fraud conviction as an aggravated
> felony.  The INS must take the plea agreement as
> the agency finds it, and in this case, . . . [t]he text
> of the plea agreement . . . definitively establishes
> that the only offense of which Chang was
> convicted falls about $9,400 shy of qualifying as
> an aggravated felony.

*Id*. at 1190.

As the Seventh Circuit observed, *Chang* "supports the
basic and sensible proposition that courts should strive to honor
the contractual agreement reached between a defendant and the
government."  *Knutsen*, 429 F.3d at 739.  This is particularly
true because

> uncertainty on whether the loss amounts specified
> in a plea agreement will control in subsequent
> removal proceedings does not benefit either party.
> Defendants may be less willing to enter into plea
> agreements in light of the uncertainty of their
> effect in any future immigration proceedings.  As
> a result, the government may be forced to expend
> unnecessary time and resources litigating and
> appealing cases that otherwise could have been

40

resolved through a plea agreement.

*Id*; *see also Chang*, 307 F.3d at 1192 ("Allowing an IJ or the INS to rely on . . . dismissed counts to trump the loss amount agreed to by both an alien defendant and the government in a plea agreement would surely lead to sandbagging of many non-citizen criminal defendants.").

Similarly, in *Knutsen*, the petitioner had been indicted on two counts of bank fraud, but pled guilty to only one, for which the loss amount was $7,350. *Id.* at 735. The second count, with a loss amount of $12,930.96, was dismissed. *Id.* For purposes of the Sentencing Guidelines, Knutsen acknowledged that the total loss from the offense of conviction and the related conduct (which encompassed the facts of the dismissed charge) exceeded $20,000, and he was ultimately ordered to pay more than $22,000. *Id.* Despite Knutsen's stipulation as to the total loss, and the fact that the charges were crimes against a single victim, the Seventh Circuit held that to be "consistent with the statute . . . the court should focus narrowly on the loss amounts that are particularly tethered to convicted counts alone," and considered only the loss amount tied to the convicted charge by the plea agreement. *Id.* at 739-40. Because our consideration is limited to the offense of conviction, we look only to the charges to which the petitioner pled guilty, and not to conduct that was neither admitted nor proven beyond a reasonable doubt.

An exception to the strict emphasis on the plea agreement was articulated by the Tenth Circuit. *Khalayleh*, 287 F.3d at 980. There, the Court recognized that the loss amount for the aggravated felony determination was limited to the offense of

41

conviction, and further noted that an order of restitution that took unconvicted conduct into account was not necessarily relevant to the loss calculation for immigration purposes. In that case, however, the count to which the petitioner had pled guilty "did not allege a discrete fraud . . . [but] alleged a scheme to defraud that encompassed a number of checks." *Id.* Put another way, "the separate counts were essentially mirror images of one another, and merely segmented the component acts of a larger fraudulent scheme." *Knutsen*, 429 F.3d at 737 (describing the indictment in *Khalayleh*). Under those circumstances, the Court used the amount of restitution ordered, over $24,000, to conclude that the offense was an aggravated felony. *Id.*

We hold that on the facts before us the loss amount relevant to Alaka's aggravated felony determination is $4,716.68 – the loss suffered by the victim of the count to which Alaka pled guilty. That conclusion is not affected by the District Court's conclusion, for sentencing purposes, that Alaka's conduct as to the dismissed charges was "part of a common scheme or plan as the offense of conviction." Allowing the loss calculated for sentencing purposes to supersede the amount designated in the plea agreement "would divorce the $10,000 loss requirement from the conviction requirement, [citing 8 U.S.C. § 1227(a)(2)(A)(iii)], because relevant conduct for sentencing purposes need not be admitted, charged in the indictment, or proven to a jury." *Chang*, 307 F.3d at 1190*; see also Knutsen*, 429 F.3d at 740 (as noted above, holding that loss amount was not more than $10,000 when petitioner stipulated "for purposes of sentencing" that the total loss exceeded $20,000 but pled guilty to count with loss of $7,350). We do not consider the loss charged in the indictment,

42

tabulated for restitution purposes, or calculated for sentencing; we determine the loss amount as the "plea agreement spells it out for us in black and white." *Chang*, 307 F.3d at 1191 (holding that "although the plea agreement gave the district court authority to order restitution with respect to all the checks Chang wrote, it also specifically provided the amount to be considered when determining the amount of loss for purposes of the aggravated felony definition").

Here, as was the case in *Knutsen* and *Chang*, Alaka "unmistakably pled guilty only to [one count], and . . . the plea agreement plainly documented that loss at [less than $10,000]." *Knutsen*, 429 F.3d at 739; *see also Chang*, 307 F.3d at 1191 ("although the indictment can be read to allege a scheme as well, the plea agreement narrows the scope of the indictment – in particular, the relevant loss to the victim"). Therefore, Alaka is not an aggravated felon because she has not been convicted of an offense that resulted in a loss to the victim of more than $10,000. Because her offense is not an aggravated felony, it cannot be a "particularly serious crime," and we accordingly grant Alaka's petition as it relates to her withholding of removal claim.

> 3.  Can dismissed charges be considered in determining whether an offense was "particularly serious"?

Our analysis of the aggravated felony conviction leads us to conclude further that the IJ similarly erred as a matter of law in considering the dismissed charges when determining whether Alaka's offense was "particularly serious." The unambiguous

language of 8 U.S.C. § 1231(b)(3)(B)(ii) limits the IJ's consideration to deciding if the petitioner has been "*convicted by a final judgment* of a particularly serious crime." (emphasis added). The plain meaning of § 1231(b)(3)(B)(ii) is that an alien can only become ineligible for withholding of removal on the basis of a "conviction." As noted, if the "intent of Congress is clear, both this Court and the agency must give effect to that legislative intent." *Knutsen*, 429 F.3d at 736 (citing *Chevron*, 467 U.S. at 842-43). We agree with the conclusion of the Fourth Circuit Court of Appeals in *Yousefi v. I.N.S.*, 260 F.3d 318, 229-30 (4th Cir. 2001), that "[w]e can find no authority for the proposition that dismissed counts or crimes . . . may be considered in determining whether a specific crime is a particularly serious one." (citing 8 U.S.C. § 1231(b)(3)(B)(ii)). Thus, even if we had determined that the bank fraud offense was an aggravated felony, we would still need to remand to the BIA for reconsideration – without taking the dismissed charges into account – of the "particularly serious crime" designation.

## IV. Conclusion

The determination of Alaka's offense as a "particularly serious crime" is not a decision conferring unreviewable discretion on the Attorney General. We therefore have jurisdiction to hold that an offense must be an aggravated felony to be considered a "particularly serious crime" and Alaka's bank fraud conviction was not an aggravated felony. Dismissed charges *ispo facto* are not convictions, and thus are not taken into account in either the aggravated felony or "particularly serious crime" analysis.

44

We accordingly grant Alaka's petition for review of her withholding of removal claim, vacate the BIA's decision insofar as it affirmed the conclusion that she committed a "particularly serious crime," and remand to the BIA for proceedings consistent with this opinion.

As we do not have jurisdiction to review the BIA's affirmance of the IJ's determination that Alaka abandoned her lawful permanent resident status and was ineligible for either § 212(c) relief or cancellation of removal, we dismiss her petition for review of those claims.