

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-26-2004

# Soltane v. US Dept Justice

Precedential or Non-Precedential: Precedential

Docket No. 03-1626

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Soltane v. US Dept Justice" (2004). *2004 Decisions.* Paper 349.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/349

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

_____

No. 03-1626

_____

CAMPHILL SOLTANE,

Appellant

v.

US DEPARTMENT OF JUSTICE;
IMMIGRATION &
NATURALIZATION SERVICE

_____

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

District Court Judge: Honorable Herbert
J. Hutton
(Civil Action No. 02-0727)

_____

Argued: December 5, 2003

Before: SLOVITER and ALITO, Circuit
Judges, and OBERDORFER, District
Judge[*]

_____

[*] The Honorable Louis F. Oberdorfer,
Senior District Judge for the District of
Columbia, sitting by designation.

(Opinion Filed: August 26, 2004)

LAWRENCE H. RUDNICK (Argued)
1608 Walnut Street, Suite 1500
Philadelphia, PA 19103

*Counsel for Appellant*

PATRICK L. MEEHAN
LAURIE MAGID
VIRGINIA A. GIBSON
SUSAN R. BECKER (Argued)
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

*Counsel for Appellee*

_____

OPINION OF THE COURT

_____

ALITO, Circuit Judge:

Camphill Soltane ("Camphill") appeals a final order of the United States District Court for the Eastern District of Pennsylvania affirming the denial of Camphill's visa petition on behalf of an employee sought to be classified as a "special immigrant religious worker." Because that denial was predicated on legal error and improper findings of evidentiary deficiency, we vacate the judgment of the District Court and remand this case for reconsideration by the agency.

**I.**

Camphill Soltane is a non-profit organization, dedicated to providing services to young adults with mental disabilities. Rooted in "Anthroposophy" and the teachings of Rudolph Steiner,

Camphill seeks to create a spiritual community through cooperative life, social interaction, and spiritual activity. "The Camphill Movement is focused on Christianizing the ordinary aspects of life for the mentally handicapped as well as for the fully able members of the community . . . ." Appellant Br. at 6.

Since 1996, the Chester County facility of Camphill has employed Annagret Goetze, a citizen and native of Germany. Goetze was originally admitted into the United States in the R-1 classification as a nonimmigrant religious worker. In 2000, Camphill filed an I-360 immigrant visa petition on behalf of Goetze with the Immigration and Naturalization Service (INS).[1] This petition sought to have Goetze classified as a special immigrant religious worker so that she could serve in the proposed position of houseparent, music instructor, and religious instructor at the Camphill facility.

The Vermont Servicing Center of the INS made a request for further evidence showing that Goetze had two years of experience in a religious occupation and that she had received specific religious training. App. I at 32. Camphill responded with explanations of the training process and the religious nature of the position, see App. II at 59-61, as well as a set of literature (some authored by Steiner) that discussed Anthroposophy and the "Camphill Movement" and was presumably submitted as representative training material. See App. II at 62-146.[2] Notwithstanding the supplemental submissions, the INS denied Camphill's petition in February 2001, finding that Camphill had failed to establish that Goetze was to be employed in a religious occupation, as required under the regulations. App. I at 31.

Camphill filed a timely appeal with the Administrative Appeals Unit. In December 2001, a final administrative decision was rendered by the Administrative Appeals Office (AAO) of the INS. Reviewing the record de novo, the AAO affirmed on four independent grounds, any one of which alone could have justified the denial: (1) Camphill did not qualify as a religious organization as required by 8 U.S.C. § 1101(a)(27)(C); (2) the proposed position of houseparent was neither a religious occupation nor a religious vocation; (3) there was insufficient evidence to determine whether Goetze had worked in a religious position for two years preceding the petition; and (4) Camphill provided insufficient evidence to prove that there was a

---

[1]The INS has ceased to exist as of March 1, 2003, and has been replaced by the Bureau of Citizenship and Immigration Services. We nevertheless use the term INS throughout this opinion (as do the briefs) for the sake of consistency.

[2]For example, App. II at 86 is a sheet labeled "Study Material" listing several sources, some of which appear to be included in the administrative record.

qualifying tender of a job to Goetze.

Camphill appealed for review of the AAO decision in the Eastern District of Pennsylvania, under the Administrative Procedure Act (APA). In February 2003, the District Court entered judgment against Camphill, affirming the AAO decision on all four grounds. This appeal followed.

## II.

As a preliminary matter, we are required to consider the issue of subject matter jurisdiction, even though neither party contends that it is lacking here. See Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986) ("[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it.") (internal quotes omitted). The jurisdictional question in this case centers on 8 U.S.C. § 1252(a)(2)(B)(ii), which provides in pertinent part:

> Notwithstanding any other provision of law, no court shall have jurisdiction to review . . . any other decision or action of the Attorney General the authority for which is specified under this title [8 U.S.C. §§ 1151 et seq.] to be in the discretion of the Attorney General, other than the granting of relief under [8 U.S.C. § 1158(a)] [governing asylum].

Id. In this case, the statutory basis for Camphill's visa request was 8 U.S.C. § 1153(b)(4), which governs the issuance of preference visas to "certain special immigrants," including those engaged in a "religious occupation or vocation," see id. § 1101(a)(27)(C)(ii). If the AAO's denial of Camphill's visa request constituted a "decision or action of the Attorney General the authority for which is specified under this title to be in the discretion of the Attorney General," then under § 1251(a)(2)(B)(ii) the District Court lacked jurisdiction to review the agency action.

The key to § 1251(a)(2)(B)(ii) lies in its requirement that the discretion giving rise to the jurisdictional bar must be "specified" by statute. In other words, "the language of the statute in question must provide the discretionary authority" before the bar can have any effect. Spencer Enterprises, Inc. v. United States, 345 F.3d 683, 689 (9th Cir. 2003). For example, in Spencer Enterprises, the Ninth Circuit found no discretion specified in a statute that listed "clear[] . . . eligibility requirements" with instructions that a visa "shall" issue when those requirements are met. By contrast, in Urena-Tavarez v. Ashcroft, 367 F.3d 154 (3d Cir. 2004), we found that the statute at issue "explicitly assign[ed]" discretion to the Attorney General, focusing on the use of specific language to that end ("discretion" and "sole discretion"), together with instructions that certain actions "may" (as opposed to "shall") be taken when any of the enumerated conditions is satisfied.

The statute at issue in this case provides:

> Visas shall be made available, in a number not to exceed 7.1 percent of such worldwide level, *to qualified special immigrants* described in [8 U.S.C. § 1101(a)(27)] (other than those described in subparagraph (A) or (B) thereof), of which not more than 5,000 may be made available in any fiscal year to special immigrants described in subclause (II) or (III) of [8 U.S.C. § 1101(a)(27)(C)(ii)(II) or (III)], and not more than 100 may be made available in any fiscal year to special immigrants, excluding spouses and children, who are described in [8 U.S.C. § 1101(a)(27)(M)].

8 U.S.C. § 1153(b)(4) (emphasis added).

A "special immigrant," as that classification pertains to ministers and other religious workers, is defined as:

> (C) an immigrant, and the immigrant's spouse and children if accompanying or following to join the immigrant, who–
>
> (i) for at least 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States;
>
> (ii) seeks to enter the United States–
>
> (I) solly for the purpose of carrying on the vocation of a minister of that religious denomination,
>
> (II) before October 1, 2008, in order to work for the organization at the request of the organization in a professional capacity in a religious vocation or occupation, or
>
> (III) before October 1, 2008, in order to work for the organization (or for a bona fide organization which is affiliated with the religious denomination and is exempt from taxation as an organization described in section 501(c)(3) of the Internal Revenue Code of 1986) at the request of the organization in a religious vocation or occupation; and
>
> (iii) has been carrying on such vocation, professional work, or other work continuously for at least the 2-year period

described in clause (i);

8 U.S.C. § 1101(a)(27)(C).

The language of 8 U.S.C. § 1153(b)(4) makes clear that the Attorney General is required to grant preference visas to those who fall within certain numerical limits and qualify as "special immigrants" under § 1101(a)(27). These relevant numerical limits are set by statute, see 8 U.S.C. § 1153(b)(4), and the definition of "special immigrant" (as relevant to religious workers) is fairly detailed and specific, with no explicit reference to "discretion" as in Urena-Tavarez. In fact, 8 U.S.C. § 1153(b)(4) bears some similarity to the neighboring provision, 8 U.S.C. § 1153(b)(5), which was analyzed in Spencer Enterprises, in that it sets forth specific eligibility requirements, with instructions that the visa "shall" issue if those requirements are met. Accordingly, we do not read § 1153(b)(4) as having "specified" that the granting of the visas in question "be in the discretion of the Attorney General."

We note that the dissent in Spencer Enterprises criticized the majority in that case for what it believed was an overly "mechanical" approach, including reliance on the semantic distinction between "may" and "shall." See Spencer Enterprises, 345 F.3d at 696-98. (Beezer, J., dissenting). We agree that the question of whether discretionary authority has been specified by statute should be considered by examining the statute as a whole. But we do not think (as the Spencer Enterprises dissent goes on to suggest) that the use of

marginally ambiguous statutory language, without more, is adequate to "specific[y]" that a particular action is within the Attorney General's discretion for the purposes of § 1252(a)(2)(B)(ii). Of course, in a sense, an agency generally has "discretion" under Chevron to interpret ambiguous language used in a statute it administers. But if that sort of ubiquitous "discretion" were sufficient by itself to satisfy § 1252(a)(2)(B)(ii), the effects of that jurisdictional bar would be sweeping indeed. We do not believe that Congress intended such a result.[3]

For these reasons, we hold that a preference visa determination under § 1153(b)(4) is not a "decision or action of the Attorney General the authority for which is specified under this title to be in the discretion of the Attorney General." The jurisdictional bar of § 1252(a)(2)(B)(ii) is therefore inapplicable in this case.

---

[3]Furthermore, if "discretion" under § 1251(a)(2)(B)(ii) means nothing more than the "application of facts to principles," see Spencer Enterprises, 345 F.3d at 699 (Beezer, J., dissenting), then it is hard to imagine any action by the Attorney General under the relevant title that would *not* be deemed discretionary. For example, the substantial evidence standard under which we review many immigration actions contemplates that in some cases there will be a range of acceptable outcomes among which an adjudicator might reasonably choose. 8 U.S.C. § 1252(b)(4)(B).

5

## III.

We now turn to the merits of the appeal. Under the Administrative Procedure Act, we will reverse agency action if it is "arbitrary, capricious, [or] an abuse of discretion," or "unsupported by substantial evidence." 5 U.S.C. § 706; Spencer Enterprises, 345 F.3d at 693. We defer to both formal and informal agency interpretations of an ambiguous regulation unless those interpretations are "plainly erroneous or inconsistent with the regulation." Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945); Thomas Jefferson University v. Shalala, 512 U.S. 504, 512 (1994); Auer v. Robbins, 519 U.S. 452 (1997).[4]

---

[4]We need not decide whether the AAO adjudication in this case is best characterized as "formal" or "informal," since the outcome in terms of deference is the same. See Caruso v. Blockbuster-Sony Music Entertainment Ctr., 193 F.3d 730, 733 (3rd Cir. 1999); Scott H. Angstreich, Shoring Up Chevron: A Defense of Seminole Rock Deference to Agency Regulatory Interpretations, 34 U.C. Davis L. Rev. 49, 56 (2000) ("[A]n interpretation of a regulation in a format lacking the force of law warrants Chevron-style deference, but such an interpretation of a statute does not."); Note, 114 Harv. L. Rev. 359, 377-78 (2000) ("The Auer Court . . . held that agencies can issue authoritative interpretations of their own ambiguous regulations outside [the procedural] strictures [of the APA]."); cf. U.S. v. Mead Corp., 533 U.S. 218, 227-29

## A.

We first consider the question whether Camphill qualifies as a "religious organization" under § 1101(a)(27)(C). The associated regulation at 8 C.F.R. § 204.5(m)(3) mandates that petitioners prove eligibility for tax-exempt status under "section 501(c)(3) of the Internal Revenue Code of 1986 as it relates to religious organizations." Id. The AAO held that "[o]nly organizations classified, or classifiable, as 'churches' . . . are qualifying religious organizations for the purpose of special immigrant religious worker classification." App. I at 25.

The government later informed the Court that "the agency [was] in the process of issuing a memorandum that . . . broadens its interpretation of when an organization may qualify as a 'bona fide religious organization,'" and that it therefore desired to withdraw its argument that Camphill had not qualified for the special immigration visa on the ground that it was not a "church." Appellee Letter Br. at 1.[5] We accept this concession, and

---

(2001) (agency's informal interpretation of a *statutory* ambiguity does not merit Chevron deference).

[5]See William R. Yates, U.S. Citizenship and Immigration Services, Extension of the Special Immigrant Religious Worker Program and Clarification of Tax Exempt Status Requirements for Religious Organizations (December 17, 2003), available at http://www.ilw.com/lawyers/immigdaily/doj_news/2004,0113

therefore proceed under the assumption that Camphill qualifies as a "religious organization."

## B.

We next consider whether the AAO decision can be affirmed on the ground that the proposed position of houseparent is not a "religious occupation."[6] This term is defined by regulation as follows:

> *Religious occupation means an activity which relates to a traditional religious function.* Examples of individuals in religious occupations include, but are not limited to, liturgical workers, religious instructors, religious counselors, cantors, catechists, workers in religious hospitals or religious health care

-religiouswker.pdf.

[6]Camphill originally argued that Goetze's position also constituted a "religious vocation," as that term is defined in 8 C.F.R. § 204.5(m)(2). The AAO rejected that position, and Camphill does not appear to challenge that determination on appeal. Aside from a passing reference to the "religious vocation" term in its brief, Camphill's argument is centered entirely on the meaning of the term "religious occupation." See Appellant Br. at 23-28; Appellant Reply Br. at 8-15.

facilities, missionaries, religious translators, or religious broadcasters. This group does not include janitors, maintenance workers, clerks, fund raisers, or persons solely involved in the solicitation of donations.

8 C.F.R. § 204.5(m)(2) (emphasis added). The AAO found that the "duties of the position [of houseparent] involve the care of the mentally handicapped," and that "[s]uch duties are considered a wholly secular function, even if the facility is operated by a charitable organization founded on religious principles." App. I at 26. The AAO further explained that "[t]he service interprets the pertinent regulations to require that such positions are traditionally full-time salaried positions requiring specific religious or theological training," and that Camphill had failed to show that the position of houseparent satisfied this definition. Id. On appeal, Camphill argues that the INS erred in interpreting § 204.5(m)(2) in a manner that excluded the position in which Goetze was to serve.

We agree with Camphill that the AAO improperly applied the regulation in this case. The characterization of Goetze's position as not "relat[ing] to a traditional religious function" suggests that the conclusion was predetermined. The AAO first described what Goetze did in terms that excluded any mention of the religious component of her duties—saying that her job was to care for the mentally

7

handicapped—and then concluded that she was performing a secular function because its own characterization of what she was doing was secular. The same approach could be used as a basis for concluding that most of the positions explicitly listed in the regulation are secular. For example, § 204.5(m)(2) mentions "religious translators," who might be described as performing the function of translation, a "secular" activity. Similarly, "religious counselors" perform the function of counseling troubled individuals, which could also be characterized as secular. Accordingly, we believe the AAO's analytic approach is inconsistent with the text of the regulation.

We note that the regulation specifically excludes certain workers, such as "janitors" and "maintenance workers," who perform *wholly* secular functions, but this does not mean that a person cannot qualify as having a "religious occupation" if the worker's job includes *both* secular and religious aspects. In this vein, we note that the commentary accompanying the promulgation of § 204.5(m)(2) provides that "[i]f [a] job has *no religious significance*, then the fact that a person is a member of a religious denomination working in a facility run by the denomination would not by itself make that person a religious worker." 56 Fed. Reg. 66965 (Dec. 27, 1991) (emphasis added). We take this language as suggesting that a job may qualify under the regulation if it has *some* religious significance. To the extent that the AAO read § 204.5(m)(2) as requiring that a

"religious occupation" involve *only* religious functions, we believe that its interpretation is inconsistent with the text of the regulation and other indications of the agency's intent and is accordingly not entitled to deference. Thomas Jefferson, 512 U.S. at 512.

Alternatively, if the AAO's decision is read as finding that the position of houseparent involved only secular functions, we do not find that conclusion supported by substantial evidence of record. Camphill consistently testified that Goetze's position involved a number of clearly religious responsibilities, including "imbuing residents with the religious values and practices of Camphill[;] conducting house-based activities, including practical chores, prayer, festival celebrations and Bible readings[;] instructing other staff in the practices and Christian values of Camphill life[;] [and] [t]eaching religious subjects and values to mentally retarded young adults." App. I at 35. Moreover, the religious texts included in the administrative record, including transcripts from a series of lectures entitled "Curative Education," App. II at 62-85, appear to provide some support for Camphill's contention that even the prescribed manner of care for its mentally handicapped residents involved religious aspects. The AAO did not analyze or otherwise engage this evidence, but rather stated perfunctorily that Goetze's duties are "wholly secular." There is little or no support in the record for that claim.

Finally, we consider the AAO's position that a "religious occupation" must

8

be a "traditionally full-time salaried position[] requiring specific religious or theological training." This interpretation is similarly questionable. The requirement that the position be "salaried" appears to be inconsistent with the list of religious occupations given in the regulation itself, which includes positions—perhaps most notably "missionaries"—who do not always receive salaries. We further note that in promulgating the final rules at issue, the agency explicitly stated that they had been "revised to account more clearly for *uncompensated* volunteers, whose services are engaged but who are not technically employees." 56 Fed. Reg. 66965 (Dec. 27, 1991) (emphasis added).

With respect to the "full-time" and "religious or theological training" requirements, assuming for the sake of argument that such requirements are consistent with the regulation, we see no evidence that the position offered by Camphill would not qualify. Camphill indicated to the agency that Goetze's responsibilities required at least 80 hours of labor per week, see App. I at 35, and that she would be working "full-time," without "supplemental employment." Id. at 36. Camphill also submitted detailed descriptions of its training process, see App. II at 59-61, as well as extensive excerpts from its religious texts in response to the agency's request for training curriculum. See App. I at 32; App. II at 62-146. Again, there is no suggestion in the AAO's opinion that this evidence was ever considered—only the bald assertion that Camphill had "not

shown that the position of houseparent is traditionally a permanent salaried position or that the duties of the position require specific religious training." App. I at 26. This is insufficient to constitute substantial evidence in support of the AAO's conclusion.

We need not set forth here a definitive test regarding when a job may or may not be characterized as a "religious occupation." However, we think it clear that the AAO has failed to show why the position offered by Camphill to Goetze in this case does not qualify. Accordingly, we cannot sustain the decision of the AAO on this ground without further evidence or explanation.

## C.

The other two reasons underlying the AAO's denial of Camphill's visa application had to do with purported evidentiary deficiencies. Specifically, the AAO held that Camphill had not proven that Goetze had two years of continuous experience in the relevant occupation, see 8 C.F.R. § 204.5(m)(1), nor had it proven that a "qualifying job offer" had been tendered to Goetze, see id. § 204.5(m)(4).

It is true that Camphill did no more than submit a letter explaining (among other things) that Goetze had been employed by Camphill for four years, see App. II at 35, and that she would continue to receive room, board, medical insurance, etc., as compensation for her work, see App. II at 36. On the other hand, the AAO decision does not explain in any reasonable detail why this evidence was

9

insufficient. The AAO simply states that "supporting documentary evidence" should have been submitted, and cites Matter of Treasure Craft of California, 14 I. & N. Dec. 190 (Reg. Comm. 1972), for the proposition that the petitioner in visa proceedings bears the evidentiary burden of proof.

Of course, there is no doubt that Camphill bore the burden of proof in this case; again, the critical question is *why* the letter presented by Camphill was insufficient to sustain that burden. In this respect, Treasure Craft is easily distinguished from this case. There, the petitioner went on record as declaring that competent training in the pottery industry was not available in Mexico. The Regional Commissioner deciding the case took administrative notice of the fact that Mexico had a thriving pottery trade, and accordingly held that the assertions by the petitioner were insufficient to sustain the burden of proof. Here, by contrast, there was no similar administrative notice opposing Camphill's documentation to the effect that Goetze did indeed undergo significant religious training, was employed by Camphill for two years, and had been extended a job offer.

"An agency's rejection of uncontradicted testimony can support a finding of substantial evidence." Tieniber v. Heckler, 720 F.2d 1251, 1254 (11th Cir. 1983); see also NLRB v. Walton Mfg. Co., 369 U.S. 404, 408 (1962). However, an agency is generally under at least a minimal obligation to provide adequate reasons explaining why it has rejected uncontradicted evidence. See Richard J. Pierce, Jr., 2 Administrative Law Treatise § 11.2 at 791 (2002). For example, if the AAO ruling was based on a determination that Camphill's assertions were not credible, then there should have been some sort of finding regarding credibility, either explicit or implicit. See Tieniber v. Heckler, 720 F.2d at 1254 (describing "strict" and "lenient" approaches by courts); see also Choratch v. Finch, 438 F.2d 342, 343 (3d Cir. 1971) ("We think it is not too much to require that an administrative decision that a claimant is not eligible . . . be supported by explicit findings of all facts that are essential to the conclusion of ineligibility."). The AAO makes no effort to explain or suggest why it rejected Camphill's detailed letter explaining the nature of Goetze's position.

Furthermore, Camphill notes that INS regulations place an obligation on the part of the INS to request additional evidence if that which was already submitted is deemed insufficient. See 8 C.F.R. § 103.2(b)(8) ("where there is no evidence of ineligibility, and initial evidence or eligibility information is missing or the Service finds that the evidence submitted either does not fully establish eligibility for the requested benefit or raises underlying questions regarding eligibility, the Service *shall* request the missing initial evidence") (emphasis added).[7] The INS does not

---

[7]For example, although the AAO mentions that Camphill might have submitted Goetze's tax documents to show

10

provide any explanation, either in the AAO ruling or in its brief on appeal, as to why this regulation would be inapplicable in this case.

Because the AAO's rejection of the evidence regarding Goetze's work experience and job offer does not appear to be supported by substantial evidence, we conclude that the AAO decision may not be sustained on these grounds without further evidence or explanation.

**IV.**

None of the arguments advanced by the AAO in support of the visa denial withstand scrutiny on appeal. The AAO clearly did not "consider[] all relevant [evidentiary] factors" in this case, Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985), nor did it properly interpret its regulation defining "religious occupation." The "proper course" is therefore to "remand to the agency for additional investigation or explanation." Id.

---

that she had been employed full-time by Camphill without engaging in supplemental employment, see App. I at 27, it is clear that the initial request for additional evidence issued by the INS, while it demanded several items of information from Camphill, did not make any demand for tax documents. App. I at 32.

11