

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-19-2007

# Bekhit v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-2120

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Bekhit v. Atty Gen USA" (2007). *2007 Decisions.* Paper 724.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/724

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-2120
_____

SAMEH SOLIMAN BEKHIT
Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
Respondent
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
U.S. Department of Justice, Executive Office of Immigration Review
(BIA No. A46-434-147)
I.J. Annie S. Garcy
_____

Submitted under Third Circuit L.A.R. 34.1(a)
June 29, 2007
_____

Before: BARRY, FUENTES, and GARTH, Circuit Judges

(Filed: July 19, 2007)

_____

OPINION
_____

Garth, Circuit Judge:

1

Petitioner Sameh Soliman Bekhit seeks review of a March 10, 2006 decision of the Board of Immigration Appeals ("BIA" or "Board") which affirmed the decision of an immigration judge ("IJ") to deny petitioner's applications for asylum, withholding of removal, protection under the Convention Against Torture ("CAT"), and a waiver under § 212(k) of the Immigration and Nationality Act ("INA"). We will dismiss Bekhit's petition in part and deny it in part.

I

Petitioner is a twenty-nine year old male citizen of Egypt. He first entered the United States in 1997 as a derivative beneficiary of a diversity lottery visa awarded to his father. His father, however, never did immigrate to the United States; according to petitioner, his father developed medical problems necessitating surgery and rendering him incapable of traveling. In 2004, the Department of Homeland Security placed petitioner in removal proceedings under 8 U.S.C. § 1227(a)(1)(A), as an alien inadmissible at entry for lack of a valid entry document.[1]

Bekhit conceded removability, and applied for asylum, withholding of removal, and CAT protection. At the hearing before the IJ, petitioner stated that he had been persecuted in Egypt because he was a Coptic Christian,[2] and that he feared returning there. He said that

---

[1]Children of lottery winners who are derivative beneficiaries must accompany or follow the principal beneficiary. *See* 8 U.S.C. § 1153(d).

[2]Neither party's brief defines "Coptic" Christian, the branch of Christianity of which Bekhit claims to be a member.

a high school teacher had given him failing grades on tests because he was a Christian. However, Bekhit admitted that he nevertheless graduated high school and enrolled in college in Damanhur, Egypt.

Petitioner told of one occasion where, at his university, he encountered members of the Gamaa Islamiya, or Islamic Group ("IG"), distributing flyers "against Christianity." (Administrative Record ("A.R.") 149.) When he proceeded to "collect[] these reports and flyers from the people, and when they knew that [he] did that they picked on [him] and persecuted [him]" by "beat[ing] him up." *Id.* Bekhit said that he told the police, but they "didn't do anything to help [him] out." *Id.* He asserted that the police only protect Muslims. When asked the basis for this belief, he responded that in Egypt, "all the positions for the government officials are held by Muslims." (A.R. 151.)

Bekhit testified that the "worst" example of persecution of Christians happened to his sister in 1996. He stated that she was pushed to the ground, breaking some sort of lens and hurting her eye, and that the doctor and nurse she went to see to fix the problem were both Muslim. Petitioner initially testified that after the doctor found out that the sister was Christian, "nothing was done to her and [his] sister . . . can't see." (A.R. 153.) Later, though, Bekhit testified that the doctor did in fact operate on the eye, but his sister lost vision in that eye completely "because of that doctor." (A.R. 157.)

Petitioner stated that in April 1997, he and friends were attacked outside of church by IG members, who "beat us up." (A.R. 159.)

Bekhit told the court that in August 1997, his father won a lottery visa but was unable to immigrate to the United States because he became ill with prostate cancer. Petitioner moved to the United States alone, while his parents and three sisters remained in Alexandria, Egypt, in the same house where petitioner had been raised.

Petitioner testified that he returned to Egypt in 2001 for his sister's wedding, and he stayed for a month and a half. He stated that on arrival, he was detained for ten hours at the airport by an official who was "checking the system . . . trying to find anything against me." (A.R. 164.) Bekhit said that the official punched him in the face, but released him after not finding any reason to continue to detain him.

On cross-examination, Bekhit stated that there are three churches in the neighborhood where he lived in Alexandria. He admitted that he has kept in close touch with his family in Egypt, and that none of them have been mistreated, nor has anyone been looking for him or asking about him. Petitioner's mother came to visit him in the United States in 2003 and returned to Egypt. Bekhit said as a result of the physical mistreatment he endured, he received "[o]nly bruises and scratches that are not permanent or needed medical treatment in a hospital." (A.R. 180.)

The IJ received in evidence the State Department's 2003 country report for Egypt, in which the State Department observed that "the practice of Christianity . . . does not conflict with Shari'a and significant members of the non-Muslim minority worship without harassment." (A.R. 289.) The report further noted that while there was some "discrimination

4

against minority religions, including Christians," there were seven Christians in the People's Assembly and two in the 32-member cabinet. (A.R. 290, 293.) Finally, the report indicated that during the 2003 reporting period, there were "no new reports of violent assaults by the IG or other suspected terrorists against the approximately 6 million Coptic Christians," and although "conflicts with injuries and property occurred during the year . . . it was difficult to determine whether religion was a factor." (A.R. 291.)

On November 29, 2004, the IJ issued an interlocutory decision, denying Bekhit's applications for asylum, withholding of removal, and CAT protection. The IJ found that petitioner had failed to establish either past persecution or that he possessed a well-founded fear of future persecution in Egypt by "fundamentalist Muslims . . . on account of his religion as a Coptic Christian or membership in a particular social group comprised of members of [his] faith." (A.R. 368.)

The IJ found that harassment by a possibly "bigoted teacher" did not constitute persecution, and, in any event, petitioner was still able to graduate high school and enroll in a university. (A.R. 370.) Further, regarding Bekhit's allegation of being beaten by IG members at his college, the IJ noted that Bekhit conceded that he had interfered with the IG members' distribution of leaflets, and that this "so enraged [them] . . . they set upon [him] and beat him up." (A.R. 371.) This, the IJ found, was not persecution due to religion, but rather the attack was due to his interference with their pamphlet distribution. Nevertheless, even assuming the beating was due to religion, the IJ observed that Bekhit "remained in the

5

university even until 1997 when he left his country, and there is no evidence of any continuing harm." (A.R. 372.) "In other words," the IJ found, "the change in circumstances is demonstrated by [petitioner's] own testimony that he remained in the university until he left his country the following year." *Id.*

In addition, the IJ observed that there was "no objective evidence" to support Bekhit's assertion that "the police would never help Christians." *Id.* Rather, the record evidence indicated that "during the 90s, the government of Egypt was furious with the Gamaat Islamiya and was arresting them because the Gamaat Islamayia was trying to overthrow the government." *Id.*

The IJ also found that the story of how Bekhit's sister lost vision in one eye did not help establish Bekhit's persecution claim. The IJ said that Bekhit "automatically blames the doctor because of the doctor's [Muslim] religion . . . [and has] just jumped to a conclusion without any real objective evidence." (A.R. 373.) This "bigoted attitude about . . . the doctor" established no "connection at all to [petitioner's] asylum claim" and merely "diminished the Court's opinion about the [petitioner's] objectivity." (A.R. 374.) Moreover, the IJ noted that Bekhit's sister is now a university student studying radiology, and "there is no evidence that she is having any problems with anybody because of her religion." *Id.*

Regarding petitioner's story of being beaten outside his church by members of the IG, the IJ stated that there was "no evidence that these individuals knew [petitioner] individually, knew him by name, tracked him down to his house, or had pinpointed [him] in any specific

6

form," or that he had been "threatened before or after those . . . events took place." *Id.*

The IJ further noted that in all the years Bekhit lived in the United States, he "reports no troubles between his family and members of the Gamaat Islamiya or any Muslims for that matter." (A.R. 375.) The IJ observed that "there is no evidence that [Bekhit's] family has had problems living in their home, going about their businesses, that his sister has had problems in college, or that anybody intruded on [his sister's] wedding that took place at St. Mary's Church on January 8, 2001." *Id.* In fact, while Bekhit was in Egypt in 2001, "[n]o one came to the house" to look for him, his "going about was not intruded or impeded," he was able to attend his sister's wedding, and he "left Egypt without any kind of interference." (A.R. 376.) In addition, the IG stated that the letters from Bekhit's priest in Egypt that Bekhit submitted in support of his claim contained no reference to any problems with the IG, even though Bekhit stated he spoke about these problems with the priest in the past.

Furthermore, the IJ pointed out that while Bekhit "insists that if he were to go back that he would be killed," Bekhit in fact "did go back and was not killed." (A.R. 378.)

The IJ thus concluded that with regard to "future persecution, there is no evidence that [Bekhit] has stated any individualized claim." *Id.* He similarly failed to "show a pattern of practices of persecution throughout Egypt with regard to how Coptic Christians are treated at this time." (A.R. 380.) As support, the IJ relied on Bekhit's testimony that "there are several churches in his own neighborhood," and on the report from the State Department that Egypt's "government has conducted arrests against members of the Gamaat Islamiya and

7

fundamentalist Muslims because they threaten the security . . . of their nation." *Id.* The IJ stated that there was no "objective evidence in support of [petitioner's] supposed subjective fear." *Id.* Accordingly, the IJ denied Bekhit's claims for asylum and withholding of removal.

Regarding the CAT application, the IJ found that the punch in the face by the airport official "indicate[d] anger but not a desire to torture [petitioner.]" (A.R. 381.) Moreover, the IJ stated that the record lacked any evidence to show that "the police ever sought out [Bekhit] after he was released from the airport" despite the fact that the police "knew where to find him." (A.R. 382.) Furthermore, the IJ noted that Bekhit's family has never mentioned to him that the police have been looking for him since he departed Egypt in 2001. The IJ denied Bekhit's claim for CAT protection.

After issuing the November 29, 2004 decision, the IJ adjourned the proceedings to enable Bekhit to prepare a request for a waiver of inadmissibility under INA § 212(k). Resuming on March 22, 2005, the IJ noted that Bekhit failed to submit a brief or any other material in support of the waiver request. However, the IJ evaluated the claim in court and issued a second decision, fully incorporating the previous interlocutory order and denying Bekhit a § 212(k) waiver.

The IJ decided that Bekhit failed to merit a § 212(k) waiver where he admitted that he "precede[d] his father into the United States." While Bekhit alleged that his father could not immigrate because of a health condition, he had provided nothing to substantiate that

8

claim, or to negate the reasonable inference that Bekhit's father had simply voluntarily determined he did not want to immigrate to the United States. (A.R. 89.) Bekhit's inability to support his story with any documentary evidence was "incredible," where Bekhit also provided nothing to show that Egypt "lacks mail services, telephones, copier machines, computers, or any of the . . . equipment that would be necessary to generate supporting evidence in this case." (A.R. 91.) The IJ thus concluded that Bekhit had presented "insufficient evidence to convince the Court that he is eligible for a waiver . . . under section 212(k)." (A.R. 92.)

Following this decision, Bekhit retained new counsel and moved to reopen proceedings with the BIA, arguing that Bekhit's prior counsel was ineffective in handling the § 212(k) waiver application. He argued that the failure to obtain medical evidence substantiating the story of Bekhit's father's illness was "prejudicial as it directly affected the outcome in this matter." (A.R. 42.) Later, however, in his brief on direct appeal, Bekhit argued that whether or not such evidence was presented, this issue was completely irrelevant to the proper inquiry necessary for determining eligibility for a § 212(k) waiver. Instead, Bekhit contended that the only relevant issue was whether Bekhit "could have known, through exercise of reasonable diligence, that he was inadmissible at the time he applied for admission to the United States." (A.R. 23.)

On March 10, 2006, the BIA issued an opinion dismissing Bekhit's appeal and affirming the IJ's denial of relief. The BIA agreed with the IJ's determination that Bekhit,

"a Coptic Christian, failed to meet his burden of proof to establish that he suffered past persecution or that a reasonable person in his circumstances would have a well-founded fear upon return to Egypt." (A.R. 2.)

Regarding petitioner's application for a § 212(k) waiver, the BIA agreed with the IJ that Bekhit "failed to produce sufficient evidence at the time of his hearing to support his application." (A.R. 3.) Moreover, the BIA declared that "[e]ven if we accepted the evidence filed with [Bekhit's] appeal," his application "should still be denied" because he had not demonstrated, as required under § 212(k), that "he . . . did not know or could not have known by the exercise of reasonable diligence before departure to the United States that he . . . was inadmissible." *Id.* On the contrary, the BIA found that Bekhit "could have ascertained by the exercise of reasonable diligence that he was ineligible for admission to the United States on December 26, 1997, as the derivative beneficiary of a lottery winner, because [he] did not accompany or follow to join his father, the principal immigrant visa holder; rather he preceded his father." *Id.*

Accordingly, the BIA dismissed the appeal, and this petition for review followed.

II

Bekhit first appeals the BIA's denial of his application for a § 212(k) waiver.[3] INA

---

[3]In addition, he claims that the BIA abused its discretion by "fail[ing] to consider Petitioner's motion to remand at all," and "simply affirmed the denial of the waiver because no evidence was presented at the time of the last hearing." (Pet'r Br. 7.) In fact, though, the BIA stated that "[e]ven if [they] accepted the evidence filed with [petitioner's] appeal," the waiver

§ 212(k) reads, in relevant part:

> Any alien, inadmissible from the United States under paragraph (5)(A) or (7)(A)(I) of subsection (a) of this section, who is in possession of an immigrant visa *may*, if otherwise admissible, be admitted *in the discretion of the Attorney General* if the Attorney General is satisfied that inadmissibility was not known to, and could not have been ascertained by the exercise of reasonable diligence by, the immigrant before the time of departure of the vessel or aircraft from the last port outside the United States and outside foreign contiguous territory . . . .

8 U.S.C. § 1182(k) (emphasis added).

The government contends that, per INA § 242(a)(2)(B)(ii), this Court is without jurisdiction to review the discretionary denial of a § 212(k) waiver. That section provides, in pertinent part, that:

> no court shall have jurisdiction to review . . . any other decision or action of the Attorney General . . . the authority for which is specified under this subchapter to be in the discretion of the Attorney General . . . other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B)(ii). We have determined that this jurisdiction-stripping language "applies not to all decisions the Attorney General is entitled to make, but to a narrower category of decisions where Congress has taken the additional step to specify that the sole authority for the action is in the Attorney General's discretion." *Alaka v. Attorney General*, 456 F.3d 88, 95 (3d Cir. 2006).[4] Bekhit's argument is that while the actual decision of

_____

application should still be denied.

[4]Notwithstanding this provision, we do retain jurisdiction, pursuant to 8 U.S.C. § 1252(a)(2)(D), over constitutional claims or questions of law. Bekhit has raised neither here.

11

whether or not to grant a waiver is a discretionary determination which this Court has no jurisdiction to review, the underlying factual determinations–that is, whether an alien is eligible for the waiver–may be reviewed despite INA § 242(a)(2)(B)(ii)'s jurisdictional prohibition. (Pet'r Br. 9.) Accordingly, Bekhit asks this Court to review the determination that he did not show that his "inadmissibility was not known to, and could not have been ascertained by the exercise of reasonable diligence by, [him] before the time of departure ." 8 U.S.C. § 1182(k).

In *Soltane v. U.S. Dep't of Justice*, 381 F.3d 143 (3d Cir. 2004), our review of the caselaw led us to the conclusion that the "key to § 125[2](a)(2)(B)(ii) lies in its requirement that the discretion giving rise to the jurisdictional bar must be 'specified' by statute." *Id.* at 146. For example, we noted that in *Spencer Enters., Inc. v. United States*, 345 F.3d 683 (9th Cir. 2003), "the Ninth Circuit found no discretion specified in a statute that listed 'clear[] eligibility requirements' with instructions that a visa 'shall' issue when those requirements are met." *Soltane*, 381 F.3d at 146. By contrast, in *Urena-Tavarez v. Ashcroft*, 367 F.3d 154 (3d Cir. 2004), "we found that the statute at issue 'explicitly assign[ed] discretion to the Attorney General, focusing on the use of specific language to that end ('discretion' and 'sole discretion'), together with instructions that certain actions 'may' (as opposed to 'shall') be taken when any of the enumerated conditions is satisfied." *Soltane*, 381 F.3d at 146.

Applying these principles to the provision at issue in *Soltane*, we noted that it not only set forth "detailed and specific" eligibility requirements, along with instructions that the visa

12

*shall* issue if those requirements are met, but also that, unlike the waiver provision in *Urena-Tavarez*, the visa provision at issue in *Soltane* contained "no explicit reference to 'discretion.'" *Id*. at 147. We therefore held that the provision in *Soltane* had not "'specified' that the granting of the visas in question 'be in the discretion of the Attorney General.'" *Id*.

The waiver provision at issue here does specify both that whether to grant a waiver is "in the discretion of the Attorney General," and that this discretion "may" be exercised to grant the waiver, not that it "shall" be exercised if the alien is eligible. In this way, a § 212(k) waiver is more similar to the waiver in *Urena-Tavarez*–which we held was covered by § 1252(a)(2)(B)(ii)'s jurisdictional bar–than to the visa in *Soltane*. We agree, then, with both petitioner and respondent that we lack jurisdiction to review the Attorney General's ultimate decision to grant or deny a § 212(k) waiver.

Nevertheless, Bekhit points out that the waiver provision in *Urena-Tavarez* not only used "may," instead of "shall," in describing the scope of the Attorney General's explicitly-referenced "discretion," but it also stated that in regard to determining *eligibility* for the waiver, the "determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General." *Urena-Tavarez*, 367 F.3d at 159. Bekhit maintains that the absence of such a statement in the § 212(k) waiver provision indicates that the underlying findings of fact which determine eligibility for the waiver are subject to judicial review. (Pet'r. Br. 10.)

We disagree. It is true that the question of whether an alien is eligible for the

13

requested relief is distinct from the question of whether that relief should be granted. In this case, however, we believe that both decisions were ones for which "the authority . . . is specified . . . to be in the discretion of the Attorney General." 8 U.S.C. § 1182(k).

Despite the fact that the word "discretion" is not used in the clause of § 212(k) relating to eligibility for the waiver, we have noted that "the jurisdictional bar [of § 1252(a)(2)(B)(ii)] might still apply even in the absence of that language." *Alaka*, 456 F.3d at 98. Indeed, here we find that, as in *Urena-Tavarez*, the factual determinations relating to eligibility have been shielded from our review by "another layer of protection." *Urena-Tavarez*, 367 F.3d at 160. Although we have concluded that the "terms 'decide[]' or 'determine' are not, standing alone, sufficient to 'specify' discretion," *Alaka*, 456 F.3d at 96, we note that here the question of eligibility is not something for the Attorney General to "decide" or "determine," but rather is dependent on whether the Attorney General "is satisfied" that eligibility has been demonstrated. In this way, "the plain language of" § 212(k) "clearly entrusts the decision to the Attorney General's discretion." *Zhang v. Gonzales*, 457 F.3d 172, 176 (2nd Cir. 2006) (Cabranes, J., concurring, joined by a majority of the panel) (finding that the statutory phrase "to the satisfaction of the Attorney General" indicates a discretionary judgment which falls within the jurisdiction-stripping provision at 8 U.S.C. § 1252(a)(2)(B)(i)). *See also Xiao Ji Chen v. DOJ*, 434 F.3d 144, 154 (2d Cir. 2006) (noting that the existence of "changed" or "extraordinary" circumstances under 8 U.S.C. § 1158(a)(2)(D), which petitioner must prove "to the satisfaction of the Attorney General," is a discretionary determination barred from

judicial review);  *Vasile v. Gonzales*, 417 F.3d 766, 768 (7th Cir. 2005) ("Permissive language that refers to demonstrating something to the agency's 'satisfaction' is inherently discretionary.").

We therefore find we are without jurisdiction to review either the decision to deny a § 212(k) waiver or the underlying factual determinations.


III

Bekhit next appeals the denial of his applications for asylum, withholding of removal, and protection under the CAT.  We have jurisdiction to review a final order of removal pursuant to 8 U.S.C. § 1252(a).  While ordinarily we review only the final order of removal, that is, the BIA's order, where the BIA relied on some of the IJ's findings, we have jurisdiction to review both opinions.  *Xie v. Ashcroft*, 359 F.3d 239, 242 (3d Cir. 2004).

We review findings of fact in immigration cases for substantial evidence, that is, "whether a reasonable fact finder could make such a determination based upon the administrative record."  *Dia v. Ashcroft*, 353 F.3d 228, 249 (3d Cir. 2003).  Under this standard, then, "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."  8 U.S.C. § 1252(b)(4)(B).

In order to be eligible for a grant of asylum, an alien must show that he is a refugee, that is, someone "unable or unwilling to return to . . . [his country of nationality] because of persecution or a well-founded fear of persecution on account of race, religion, nationality,

15

membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). It is the applicant's burden to show that he has suffered past persecution in that country or that he has a well-founded fear of future persecution if returned there. 8 C.F.R. § 1208.13. In order to establish a well-founded fear of future persecution, the applicant must demonstrate both that his fear is subjectively genuine and that it is objectively reasonable. *See Guo v. Ashcroft*, 386 F.3d 556, 564-65 (3d Cir. 2004).

In this case, the BIA upheld the IJ's denial of asylum based upon the determination that Bekhit had failed to meet his burden of proving either past persecution in Egypt or that a reasonable person in his circumstances would fear persecution if returned to Egypt. These findings are supported by substantial evidence in the record.

First, as to petitioner's allegations of past persecution, the BIA and IJ found that either the examples Bekhit invoked were not sufficiently severe to qualify as persecution or that there was insufficient evidence to indicate they were motivated by Bekhit's religion or membership in a particular social group. For example, the IJ found that even if Bekhit's teacher did fail him because of his religion, Bekhit still continued on to graduate and attend college, and that "harassment . . . by a bigoted teacher does not constitute past persecution." (A.R. 370.) The IJ came to the same conclusion with regard to Bekhit's allegation that he was beaten up outside his church, where Bekhit admitted that he sustained only scrapes and did not require medical treatment. These findings are supported by our precedent that "persecution connotes extreme behavior, including threats to life, confinement, torture, and

16

economic restrictions so severe that they constitute a threat to life or freedom." *Ahmed v. Ashcroft*, 341 F.3d 214, 217 (3d Cir. 2003) (citation and internal quotations omitted).

In addition, where Bekhit conceded that his assault by IG members in 1996 was provoked by his interference with their distribution of flyers, the record does support the finding that the confrontation was motivated by that interference and not by Bekhit's status as a Coptic Christian. Similarly, as the IJ found, there is simply no evidence in the record to support Bekhit's allegation that his sister lost vision in one eye because a Muslim doctor persecuted her by not treating her due to her religion; where Bekhit admitted that the doctor performed an operation intended to fix the problem, and offered no evidence other than speculation that the reason the surgery was unsuccessful was sabotage motivated by prejudice, the record supports the IJ's finding that there was insufficient evidence to conclude that this was an example of past persecution based on religion.

Furthermore, as the IJ noted, Bekhit's assertion that "the police would never help Christians" was contradicted by documentary evidence Bekhit submitted which indicated that during the 1990s, the Egyptian government arrested thousands of members of the IG because of the IG's campaign to overthrow the government. (A.R. 248.)

The documentary evidence Bekhit submitted was also instrumental in the IJ's and BIA's finding that petitioner had failed to establish a well-founded fear of future persecution. The IJ relied on statements in the 2003 State Department Country Report for Egypt that "the practice of Christianity . . . does not conflict with Shari's and significant members of the non-

17

Muslim community worship without harassment," A.R. 289, and that while there was some "discrimination against minority religions, including Christians," A.R. 290, there were seven Christians in the People's Assembly and two in the 32-member cabinet. (A.R. 293.) The Report also stated that during the reporting period, there were "no new reports of violent assaults by the IG or other suspected terrorists against the approximately 6 million Coptic Christians," A.R. 291, and that although "conflicts with injuries and property damage occurred during the year . . . it was difficult to determine whether religion was a factor." *Id.*

As further evidence that there was insufficient evidence that a reasonable person in Bekhit's position would fear persecution upon return to Egypt, or that there was a pattern or practice of persecuting Coptic Christians in Egypt, the IJ also noted Bekhit's testimony that there were three churches in his neighborhood; that his sister was a radiology student at the university in Cairo and there is no evidence that she is suffering any persecution due to her religion; and that Bekhit's entire family remains in Egypt and no member has reported to him that he or she has been mistreated or that anyone has been looking for him. *See Lie v. Ashcroft*, 396 F.3d 530, 537 (3d Cir. 2007) ("We agree that when family members remain in petitioner's native country without meeting harm, and there is no individualized showing that petitioner would be singled out for persecution, the reasonableness of a petitioner's well-founded fear of future persecution is diminished."). Most compellingly, however, is the fact that Bekhit returned to Egypt in 2001, remained there for two months, and attended his sister's wedding, and, by his own testimony, "nobody bothered [him] during [his] stay in

18

Egypt." (A.R. 177.)

In conclusion, there is no question that substantial evidence supports the finding that petitioner failed to show past persecution or a well-founded fear of future persecution. In addition, a reasonable factfinder would not be compelled to conclude, based on the record, that a pattern or practice of persecuting Coptic Christians exists in Egypt.

Because substantial evidence supports the finding that petitioner failed to produce sufficient evidence to qualify for asylum, it necessarily follows that he failed to meet the higher burden required for withholding of removal and relief under the CAT.

Accordingly, we will deny the petition as to the asylum, withholding of removal, and CAT claims.